

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**16   5088**

| | |
|---|---|
| JOHN DOE, | : |
| Plaintiff, | : |
| v. | : |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, a Pennsylvania Non-Profit Corporation, | :   CIVIL ACTION NO._____ |
| Defendant. | :   **JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT

Plaintiff John Doe ("John") files this Verified Complaint against Defendant The Trustees of the University of Pennsylvania ("Penn" or "the University"), and in support thereof alleges as follows.[1]

### I.   NATURE OF THE ACTION

1.   In the early morning hours of June 8, 2016, two rising senior undergraduate students at the University of Pennsylvania – John Doe, an African American male, and Jane Roe, a white female – had a consensual sexual encounter.

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym, seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein and to comply with the University's requirement that disciplinary proceedings be kept confidential. Plaintiff refers to the female complainant in the underlying student disciplinary proceeding as "Jane Roe" or "Jane,"and the witnesses the investigative team interviewed as Witness #1 and Witness #2.  As more fully set forth in the Motion, the University is fully aware of the actual identities of John Doe, Jane Roe and the witnesses, and will not be prejudiced in any way by John's use of those pseudonyms for public filings.

2.      What followed is appalling. John now stands on the brink of expulsion from the University of Pennsylvania for alleged violation of its "Sexual Violence Policy," with a permanent stain on his record. The internal University "investigation" that led to this result was so tainted by ineptitude, preconception, and bias that it violated John's contractual and legal right to a fair disciplinary process, and leaves him no choice but to seek relief from this Court.

3.      The damage to John is exacerbated by the "Final Investigative Report" recently generated by a University-employed investigator, who, in perpetuation of a stereotype of "young African American male as aggressor", manipulated the complainant's account of events, disregarded the complainant's false statement to police, ignored the complainant's motive to fabricate a story, overlooked the bias of "witnesses" who were not actually witnesses to the alleged encounter, fixated on immaterial details in an effort to discredit John, and unfairly distorted and misapplied the university's own definition of "consent."

4.      Because the sham investigation and Final Report will be the foundation for any further internal University proceedings in this case, the disciplinary process has been irreparably tainted and any attempt to further exhaust University remedies would be futile. Accordingly, this matter is ripe for adjudication in this Court.

5.      Jane affirmatively consented to having intercourse with John through her clear words and actions. She was fully capable of providing consent and John had no reason to doubt her consent. Jane walked with John to his house and up a flight of stairs with no assistance or difficulty, and entered John's bedroom of her own free will. Their sexual encounter proceeded through stages. She was fully awake the whole time and was an active participant. Afterward, she stayed with John, talked and cuddled with him, asked him to set an alarm so that she could get to work in the morning, and then went to sleep with him in his bed. Though she had been

2

drinking earlier in the evening, Jane exhibited no signs of incapacity – no slurring of speech, no unsteadiness on her feet, no inability to visualize or focus, and no indication of mental confusion as to her whereabouts, surroundings, or the passage of time.

6.    As John later learned, when Jane returned home the morning of June 8, she found her roommate (who is also her sorority sister) sitting outside the house. The roommate had returned in the middle of the night from a semester abroad, and Jane had previously agreed to be home to let her in. The roommate was upset because she had been waiting outside for hours, and had sent a text message while stranded in the middle of the night stating that she was "gonna kill" Jane.[2]

7.    According to the roommate, when she asked where Jane had been, Jane said she had been at "some asshole's place."

8.    According to Jane, she went inside the house to charge her phone and then saw the text messages from her roommate that she had not seen when she was with John, including the "I'm gonna kill you" text.

9.    According to the roommate, she later found Jane crying, and asked if Jane had been raped. Jane said "yes."

10.    Jane then went to Penn's Women's Center, then to the Special Services Department in the Division of Public Safety, and finally to the Philadelphia Police Department's Special Victim's Unit.

---

[2] Except where John reports communications between himself and others, the allegations in the Complaint regarding statements by Jane, the witnesses, and the University's investigative team are based on documents generated by the investigative team, including interview summaries and the Reports. The recital of those statements in the Complaint is not an admission that they are true or accurately reported. John has not attached the Reports as exhibits because of confidentiality and privacy concerns, and has not attached the investigator's summaries because he was not allowed to have copies. These documents could, however, be submitted for *in camera* review if the Court so desires.

11.    On June 20, 2016, Jane went to the University's Office of the Sexual Violence

Investigative Officer and filed a complaint against John. The Deputy Sexual Violence

Investigative Officer ("investigator") was assigned to investigate the complaint.

12.    On June 24, 2016, the investigator sent John an email stating that he was

investigating an allegation that John had "violated the University's Sexual Violence Policy,"

with no details. The investigator stated that he was attaching the University's "Student

Disciplinary Procedures for Resolving Complaints of Sexual Assault, Sexual Violence,

Relationship Violence and Stalking" ("Disciplinary Procedures"); "Sexual Violence,

Relationship Violence and Stalking Policy"; "Rights and Protections of Complainants and

Respondents"; and a list of advisors. In fact, he attached only the last three: the Disciplinary

Procedures document was not attached.

13.    The version of the Sexual Violence Policy which was attached to the email (and

which is attached hereto as Ex. A) was effective September 30, 2014. It defined "sexual assault"

as follows:

> **Sexual assault** (including but not limited to rape) is defined as having committed
> any of the following acts:
> • Any physical sexual contact that involves the use or threat of force or violence
> or any other form of coercion or intimidation;
> • Any physical sexual contact with a person who is unable to consent due to
> incapacity or mental or physical impairment. "Incapacity" or "impairment"
> include but are not limited to being under the influence of alcohol or drugs or
> being too young to consent.

14.    The investigator interviewed John on July 6, 2016, still without explaining what

alleged facts had given rise to the charges. John readily admitted that he and Jane had had a

consensual sexual encounter, and John answered all the questions he was asked.

15.    On July 8, 2016, the investigator emailed John a letter that was labeled

"Statement of Charge," but contained no details other than that Jane had accused him of

4

"sexually assault[ing]" her "on or about June 8, 2016," and that the investigator had found sufficient cause to investigate. The letter referred to the documents purportedly attached to the email, including the Sexual Violence Policy referenced above.

16.     On August 22, 2016, a Draft Report was issued under the names of an "investigative team," including the originally assigned investigator. The team found, "by a preponderance of the evidence, that the Respondent violated the University's Sexual Violence policy by engaging in intercourse and other sexual acts with the Complainant without her consent." Draft Report, p.13. Although the Sexual Violence Policy states that consent is "an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words *or actions*,"[3] the team misinterpreted the Policy and concluded that Jane had not consented because she said she "never said 'yes,' was never asked, and never initiated sexual contact." *Id.* The Report did not include a finding of "sexual assault" and did not address the elements of sexual assault as set forth in the University's Sexual Violence Policy.[4]

17.     The team also concluded, after considering "the facts of the case along with applicable University precedent" and "the Complainant's request that the Respondent be held accountable for his actions," that John should be expelled and that "the violation of the University's sexual violence policy and sanction shall remain on [his] academic transcript permanently." Draft Report, p.18.

18.     The Draft Report was the first time John learned of Jane's version of events, and he was shocked. He was also shocked by the way the Report was written. Far from an objective account, it cobbled together snippets of statements that match gender and racial stereotypes, all

---

[3] Ex. A.

[4] As set forth below, the conclusions and sanctions set forth in paragraphs 16 and 17 were repeated verbatim in the investigative team's Final Report.

to support the preordained conclusion. The team focused on the absence of specific conversation about sexual intercourse, dismissed John's belief that Jane was "definitely into it" and Jane's own statement that she "cooperated," and disregarded the other facts that showed affirmative consent.

19.     The Draft Report gave the parties seven calendar days to review and comment, and stated: "During that time, both parties may review the underlying evidence, exhibits and witness statements with their advisors, ***but they will not be provided copies***. . . . After considering any comments from the Complainant and Respondent, the investigative team will issue a Final Investigative Report." Draft Report, p.3 (emphasis added).

20.     John's advisor was allowed to review the investigator's interview summaries and exhibits, which included the police report and lengthy text messages, but not to make copies or a verbatim transcription. John requested copies of the documents in order to properly prepare his defense to the accusations against him, but the investigator refused.

21.     As a result of the review, John learned that Jane had given completely different stories to the police and the investigator. Jane told the police that when she and John arrived at the intersection near his home, she told him that she "was tired and wanted to go to bed," and he then "grabbed me by my hair, arm, and neck at point [sic] while pulling me into the house." According to the investigator's notes, Jane told him that John had "gently pulled her" toward the front door of his house and then "led" her up the stairs and to his bed.

22.     On September 6, 2016, after asking for and receiving a brief extension, John submitted a seven-page single-spaced response pointing out the fundamental flaws in the Draft Report.

a. John pointed out the contradiction between Jane's initial statements to the police and her statements to the investigator.

b. John pointed out that the Report not only failed to grapple with this inconsistency and its clear impact on Jane's credibility, but had misstated what Jane told the investigator, thereby shoring up the false picture of John as sexually violent: the Report said that John "pulled" her toward the house, omitting Jane's word "gently," and that John "pulled" her into the bedroom and onto his bed, though Jane had said he "led" her there.

c. John submitted photographs to the investigator to show what would have been involved in walking from the street to his room.

d. John pointed out that the investigative team had failed to acknowledge Jane's motive to fabricate a story after she learned that her roommate had been waiting outside their home for hours in the middle of the night, and had failed even to mention text messages Jane sent to her roommate that further undermine her claim that she was assaulted.

e. John pointed out that the team had relied on two witnesses without first-hand knowledge of the encounter, and had disregarded evidence that they were biased and unreliable.

f. John pointed out that the team had unfairly labeled him dishonest because of a minor discrepancy regarding the time Jane left his house, even though both parties agreed she had stayed until morning.

7

g. John pointed out that the Report inexplicably said he was "dishonest when he told the investigative team he never got out of bed and watched the Complainant dress and then leave"; both John and Jane said he did not get out of bed.

h. John pointed out that the team had failed to gather other potentially relevant evidence.

23.    John also submitted a Supplemental Statement of Facts describing the sequence of events, Jane's affectionate interactions with him, and their consensual sexual encounter – all information that would have been part of the Report had the investigative team given him fair notice of the allegations against him, fairly sought his account, and accurately summarized his interviews.

24.    John asked the investigative team to reexamine its conclusions and determine that there was no violation, or, at least, to address his concerns.

25.    Less than 48 hours later, on September 8, 2016, the investigative team issued a Final Report with the same conclusions and the same sanctions as before: expulsion and a permanent record of John's alleged violation. Final Report, p.18. The team disregarded most of the concerns John raised and did not mention or in any way address the additional clarification he provided in his Supplemental Statement about his encounter with Jane.

26.    Instead of acknowledging the inconsistencies between Jane's account to the police and to the investigative team, the team doubled down and tried to explain away the inconsistencies by altering its own description of its interview with her. In the Final Report, they said the investigator had asked Jane about her contradictory statement to the police and that she told him John had "pulled her into the house while holding her hand and using his other arm to hold her around her neck, head, and hair." Not satisfied with adding this new supposed fact, they

8

editorialized: "The investigative team took the Complainant to mean that the Respondent, not the Complainant, was in control at that point in time." Final Report, p.9.

27.     This new information appeared nowhere in the investigator's interview summary, and he acknowledged he had not "put pen to paper" on this crucial issue.

28.     Moreover, the addition is flatly inconsistent with what the interview summary did say: John "gently pulled her toward the front door." *Compare* Draft Report, p.9 with Final Report, p.9.

29.     Under the law and the University's contractual promises, John has the right to "a process that is fundamentally fair, and free of bias or prejudice" and "the right to be treated with respect, dignity, sensitivity, and fairness throughout the entire process." Student Disciplinary Procedures for Resolving Complaints of Sexual Assault, Sexual Violence, Relationship Violence and Stalking, p.2 ("Disciplinary Procedures") (https://provost.upenn.edu/policies/pennbook/2015/02/18/student-disciplinary-procedures-for-resolving-complaints-of-sexual-assault-sexual-violence-relationship-violence-and-stalking) (Ex. B); *see also* Code of Student Conduct (https://provost.upenn.edu/policies/pennbook/2013/02/15/code-of-student-conduct) (Ex. C) (promising a "fair University judicial process"); Charter of the University of Pennsylvania Student Disciplinary System (https://secure.www.upenn.edu/osc/pages/charter.html) (Ex. D) (both last viewed September 18, 2016).

30.     The disciplinary process here was inept and unfair from the outset. There was no dispute that Jane and John had a sexual encounter. The question was whether it was consensual, and Jane and John were the only witnesses. At a minimum, the accused should be given clear notice of the charges and the specific facts alleged to have given rise to the charges, the

9

investigative team should understand and properly apply the University's policy that consent can be expressed through "clear words *or actions*," the team should do a thorough and objective investigation and keep thorough and accurate records, and the team should fairly consider and weigh all factors impacting the reliability and credibility of the parties and other witnesses.

31.   None of those safeguards were honored here.

a.   The investigator did not adequately notify John of the basis for the charge against him or what the investigative team was focusing on.

b.   The investigative team interpreted the University's policy to mean there is no consent unless the accuser says yes, is asked, or initiates sexual conduct, and did not ask John the kinds of questions that would have elicited details about affirmative consent. The team also unfairly disregarded or discredited John's evidence that Jane did say "yes" several times and expressed consent through enthusiastic participation in sexual conduct.

c.   The investigative team's interview notes are incomplete and often inaccurate summaries and characterizations, with no detailed record of what the team asked and what the parties and witnesses said, or even how long the interviews were.

d.   The investigative team did not consider key factors undermining the reliability and credibility of Jane and the two witnesses they interviewed.

e.   The team applied a very different and inequitable standard to John which the team did not apply to Jane, seizing on a minor discrepancy in the time the parties said Jane left, making up another discrepancy (regarding whether he got out of bed), and then labeling him dishonest.

f.  When John confronted the team with evidence of Jane's lack of credibility and the team's own failure to accurately report the facts, the team changed the "facts" in a blatant attempt to paint John as a violent aggressor and to support at any cost the team's conclusion that John was guilty.

32.  Without these safeguards, the remainder of the process is irreparably tainted. John cannot get the fair hearing to which he is entitled because the Final Report and attached exhibits, summarizing the results of the investigation and evidence gathered, form the foundation for any further proceedings.

33.  The University, through its agents and employees, breached its contractual promises to give John a fair University judicial process, and there is no way to remedy a process that has been fundamentally tainted by the prosecutorial overreach of a supposedly neutral investigative team.

34.  The University, through its agents and employees, also breached the University's contractual promises and the laws prohibiting discrimination on the basis of race, color, or gender. *See, e.g.,* University of Pennsylvania Nondiscrimination Statement ("Nondiscrimination Statement") (http://www.upenn.edu/almanac/volumes/v55/n18/aapolicy.html (Ex. E) (last viewed September 18, 2016).

35.  The investigative team applied different standards to Jane, a white female, and John, an African American male, and concluded that John must have been the aggressor.

36.  The sanction – expulsion and a permanent label as a sexual offender – is erroneous, out of proportion to any facts on the record, and discriminatory.

37.  While in theory the University's disciplinary process is not complete, the sham investigation and Report have irreparably tainted the process. Under the University's

11

Disciplinary Procedures, if the Final Report does not resolve the matter, the next step is for the investigative team to submit the Final Report (and exhibits, including interview summaries) to a Hearing Panel made up of University faculty members and a non-voting administrator. The investigative team's addition to the Final Report of new "facts" not included in its own interview summaries confirms not only the team's bias but the complete unreliability of the investigation and the records. Either the team did not keep complete, accurate records of the investigation and interviews or it fabricated details to support its conclusions – or both.

38.    Any attempt to further exhaust the University's disciplinary process would be futile, and would only exacerbate the harm to John.

39.    The disciplinary process, as set forth in the University's Disciplinary Procedures (Ex. B), falls far short of ensuring fairness and provides John no meaningful opportunity to undo the damage that has already occurred. Among other things, the Disciplinary Procedures:

      a. Allow a University-employed and trained investigative team to find a student guilty of sexual assault, decide that he should be expelled, and place a permanent blot on his record, all without allowing the student to fully understand the nature of the allegations or to present statements, seek the production of evidence or question witnesses.

      b. Deprive the accused student of the fundamental right to cross-examine his accuser and other witnesses and to prepare an adequate defense.

      c. Fail to require investigators to maintain or provide transcripts of key interviews.

      d. Deny participants the right to have copies of the documentation the investigative team collected and relied on in its Reports.

12

e.  Adopt a preponderance of the evidence standard for alleged sexual misconduct when all other student violations are governed by a more stringent clear and convincing evidence standard.

f.  Fail to provide a meaningful and independent hearing process: the Hearing Panel consists not of independent judicial officers but of University faculty trained by the very administrators overseeing the biased investigation, and the investigative team and the team's Final Report dominate and shape the Hearing Panel process.

g.  Allow the Panel to hold an accused student responsible not only by a mere preponderance of the evidence, but by a 2-1 vote.

h.  Require the Panel, if it finds the accused student responsible, to determine the appropriate sanction with a presumption in favor of the sanction recommended by the investigative officer.

i.  Providing only a limited right to appeal the Hearing Panel's decision, to a single faculty member with "exclusive jurisdiction to decide appeals", and limiting review to whether the "process was consistent with University policy and [whether] the result was not arbitrary or capricious."

40.  When the University adopted the Disciplinary Procedures in 2015, a group of Penn Law professors wrote an open letter criticizing aspects of the policy. The concerns they raised are borne out in this case.

41.  "For a case to reach the hearing phase, the Investigative Team need find by only a preponderance of the evidence that the accused student is responsible. Further, the report, with a narrative of all of the facts and circumstances on which the Investigative Team has made a

13

determination of responsibility, will be provided to the panel. *And although the panel has the duty to hear again from the witnesses, it is difficult to understand, particularly in light of the absence of fair hearing procedures, how a panel [which the writers later note is made up of 'teachers and administrators'] would not defer to the 'expertise' of the Investigative Team, which has already conducted a full investigation.*" Open Letter, p. 3

(http://media.philly.com/documents/OpenLetter.pdf) (last viewed September 18, 2016) (emphasis added).

42. "Our legal system is based on checks and balances precisely because of the risks associated with concentrating so much power in the hands of a single investigator or Investigative Team. *What is needed is a procedure that allows the accused student's lawyer or representative to challenge the Investigative Team's version of events, to ensure that the panel will hear all the evidence that is submitted by both sides and reach its own conclusions as to the veracity of witnesses and the responsibility of the accused student.* And it should not be forgotten that these proceedings are conducted in the shadow of threats of a Department of Education investigation for failure to properly investigate and sanction students for alleged misconduct. The threat of loss of federal funding risks coloring the proceedings, particularly because a hearing panel may not feel free to acquit without repercussions." *Id.* at 4-5 (emphasis added).

43. "Our concerns about fundamental fairness are not academic or theoretical in nature. There are documented cases of a rush to judgment on charges of sexual misconduct at universities, including the Duke Lacrosse case and the recent events at the University of Virginia. In the criminal justice system, there have been a large number of post-conviction exonerations of persons convicted of serious crimes, including many sexual assault cases. Due

14

process of law is not window dressing; it is the distillation of centuries of experience, and we ignore the lessons of history at our peril. All too often, outrage at heinous crimes becomes a justification for shortcuts in our adjudicatory processes. These actions are unwise and contradict our principles. *We can and should provide protection and support for those who are subject to sexual abuse, and at the same time provide a fair process that is calculated to yield a reliable factual determination. Ultimately, there is nothing inconsistent with a policy that both strongly condemns and punishes sexual misconduct and ensures a fair adjudicatory process." Id.* at 5-6 (emphasis added).

44.     In the words of a federal court that recently denied a university's motion to dismiss certain claims filed by a student (a different John Doe) whom the university branded a sexual predator: "Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. *If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision*." *Doe v. Brandeis Univ.,* No. 15-11557, 2016 U.S. Dist. LEXIS 43499, *15 (D. Mass. Mar. 31, 2016) (emphasis added).

45.     The stakes here are high and the damage irreparable. Again, the *Brandeis* court's words apply: "John was charged with serious offenses that carry the potential for substantial public condemnation and disgrace. He was required to defend himself in what was essentially an inquisitorial proceeding that plausibly failed to provide him with a fair and reasonable opportunity to be informed of the charges and to present an adequate defense. He was ultimately found 'responsible,' and received a penalty that may permanently scar his life and career. Under

15

the circumstances, the complaint plausibly alleges that the procedures employed by [the University] did not provide him with the 'basic fairness' to which he was entitled." *Id.* at *109.

46.     The acts and omissions described in this Complaint constitute a breach of contract, tortious acts and omissions, and violations of state and federal law, including gender discrimination and race discrimination.

## II.     THE PARTIES

47.     Plaintiff John Doe is an African-American male individual who is a citizen of New Jersey. At all relevant times, John was enrolled as a full time, tuition-paying, undergraduate student at the University of Pennsylvania. Before he accepted the University's offer of admission, he was offered admission and scholarships by multiple prestigious universities.

48.     Defendant The Trustees of the University of Pennsylvania is a non-profit educational corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with an address at 3451 Walnut Street, Room 329, Philadelphia, Pennsylvania 19104. Penn is one of the oldest universities in the United States. Penn's motto for hundreds of years has been the Latin phrase "*Leges sine moribus vanae,*" which translates into English as "*__Laws without morals are useless.__*" *See* http://www.upenn.edu/about/faq (last viewed September 18, 2016).

49.     The University is ranked #9 in National Universities by U.S. News & World Report. The University describes itself as being "[i]nspired by the intellectual audacity and educational ideals of our founder, Benjamin Franklin," and "offer[ing] a compelling mixture of world-class liberal arts coursework and pre-professional education." *See* "2016 Rankings" and "School Mission and Unique Qualities," U.S. News & World Report, National College Rankings ( http://colleges.usnews.rankingsandreviews.com/best-colleges/university-of-pennsylvania-3378) (last viewed September 18, 2016).

16

50.     The University purports to prize diversity "as a central component of its mission" and to prohibit unlawful discrimination based on race. *See* "Policy on Equal Opportunity and Affirmative Action" (http://www.upenn.edu/almanac/volumes/v55/n18/aapolicy.html) (last viewed September 18, 2016).

51.     At all times material hereto, the University acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of the University's business, mission and/or affairs.

### III.     JURISDICTION AND VENUE

52.     For diversity jurisdiction purposes, John is a citizen of New Jersey and the University is a citizen of the Commonwealth of Pennsylvania.

53.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

54.     This Court also has original federal question jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, 42 U.S.C. § 1981, and 28 U.S.C. § 1331, and jurisdiction over related state common law claims under the principles of ancillary and/or pendant jurisdiction pursuant to 28 U.S.C. § 1367.

55.     Venue is proper in the Eastern District of Pennsylvania pursuant to 12 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to John Doe's claims occurred in the Eastern District of Pennsylvania and because the University of Pennsylvania resides in Philadelphia County.

### IV.     FACTUAL BACKGROUND

17

## A.    Penn's Policies and Procedures Governing Student Disciplinary Proceedings.

56.    The policies and procedures that relate to student life and discipline are published and publicly available on the University's web site and were provided to John. *See, e.g.,* https://provost.upenn.edu/policies/pennbook (last viewed September 18, 2016).

57.    These policies include the Sexual Violence Policy (Ex. A); the Disciplinary Procedures (Ex. B); the Code of Student Conduct (Ex. C); and the Charter of the University of Pennsylvania Student Disciplinary System (Ex. D).

### 1.    Penn's Contractual Promises to Afford Every Accused Student the Right to Fair University Judicial and Disciplinary Process.

58.    Under a provision titled "Rights of Citizenship," the Code "*affords every student certain rights that are essential to the University's educational mission . . . .*" Ex. C, Code, § II (emphasis added).

59.    Among the Code's four "essential rights" are *"[t]he right to be free from discrimination on the basis of race, color, [and] gender,"* and *"[t]he right to fair University judicial process in the determination of accountability for conduct.*" Ex. C, Code, § II.c, II.d (emphasis added).

60.    Likewise, in a provision titled "Statement of Purpose," the Charter provides that "[t]he purpose of the Student Disciplinary System is to further the educational mission of the University of Pennsylvania by providing *a fair and effective mechanism for investigating and resolving* disputes involving students and *alleged violations by students of the University's rules, regulations, and policies*." Ex. D, Charter, § I.A (emphasis added).

61.    The Provost of the University exercises administrative oversight of the Student Disciplinary System to "*ensur[e] that the Student Disciplinary System functions fairly and in*

18

*furtherance of the educational mission of the University.*" Ex. D, Charter, § III.A (emphasis added).

### 2.   Penn's Student Disciplinary System for Complaints of Sexual Violence.

62.     In 2015, the University adopted special Disciplinary Procedures (Ex. B) to handle Complaints alleging violations of the University's Sexual Violence Policy.

63.     In the Disciplinary Procedures, the University acknowledged again that both complainant and respondent must be treated fairly. A section titled "Rights and Protections for Complainant and Respondent" provides:

> 1.    The complainant and respondent have the right to a process that is *fundamentally fair, and free of bias or prejudice*.
> 2.    The complainant and respondent have *the right to be treated with respect, dignity, sensitivity, and fairness throughout the entire process*. They are both entitled to seek support from the University *and to be informed about the process both before the process is initiated and throughout the process as it unfolds*.
> 3.    Both parties have the right to participate in the process, or to refrain from participation.
> . . .
> 6.    While the process is underway, the Vice Provost for University Life (VPUL) will work with the complainant and respondent, ensuring support is provided to both parties.

Ex. B, § II.B (emphasis added).[5]

64.     Under the Disciplinary Procedures, when a complaint is filed, the Investigative Officer ("IO") "will make a preliminary determination as to whether the complaint falls within the purview of the Sexual Violence Policy and whether, on its face, there appears to be a sufficient basis to conduct a full investigation. In making this determination, the IO may interview the complainant and the respondent and conduct whatever preliminary investigation the Officer deems necessary to determine if the actions alleged in the complaint would, if true,

---

[5] Although the investigator's June 24, 2016 email did not attach the Disciplinary Procedures, they are available on the University's website. The email did attach a document that listed the "Rights and Protections" set forth in Section B of the Disciplinary Procedures.

constitute a violation of the University's Sexual Violence Policy and there is a reasonable basis
for investigating the charges. If the IO concludes there is insufficient basis to proceed, the matter
will be concluded and the parties so advised." Ex. B, § II.C.

65.     If the IO finds sufficient basis to proceed, the IO "will issue a Statement of
Charge Letter, based on the complaint and any preliminary investigation conducted. The Charge
Letter will be provided to the complainant and the respondent. The respondent will be provided
the opportunity to respond in writing to the Charge, and any response will be shared with the
complainant. *The IO will lead a thorough and fair investigation. . . .*" Ex. B, § II.D (emphasis
added).

66.     The investigation is to "include interviews of the complainant and respondent,
interviews of witnesses, and review of documentation, physical evidence, and any other relevant
evidence." *Id.* The Procedures require the IO to inform all participants of their rights and the fact
that statements they make may be admissible in civil or criminal proceedings. *Id.*

67.     While the parties "may have a lawyer or other advisor present when being
interviewed by the Investigative Team and the Hearing Panel," "*the lawyer or other advisor will
not be permitted to present statements, seek the production of evidence, or question any
witnesses*." Ex. B, § II.B.4 (emphasis added).

68.     The Disciplinary Procedures further provide: "At the conclusion of the
investigation, the Investigative Team will prepare a draft factual investigative report, including
assessments of credibility, a recommended finding as to responsibility, and recommended
sanctions, if appropriate. In making the responsibility determination, the Investigative Team will
use a 'preponderance of the evidence' standard." Ex. B, § II.E.

20

69.     Both complainant and respondent are to be given the draft report for review and comment. "The complainant and respondent will also be provided the opportunity to review the underlying evidence and witness statements with their advisors, *but they will not be provided copies*. The complainant and the respondent will be given the opportunity to respond to and comment on the draft investigative report in writing." Ex. B, § II.E.1 (emphasis added).

70.     "As a result of the response and comments received, the Investigative Team may conduct a further investigation and/or amend the draft report, if the Team determines either action to be warranted. A final investigative report will be prepared, incorporating any changes, and shared with the complainant and the respondent. The complainant and respondent may submit formal objections or comments to the final report, which will become part of the final report of the matter." Ex. B, § II.E.2.

71.     Under the Disciplinary Procedures, if the matter is not resolved at this stage, "the IO will present the final investigative report, together with any comments provided by the complainant and/or respondent, to a Hearing Panel ('Panel')" comprised of three faculty members and the Disciplinary Hearing Officer (DHO), who will be a non-voting member and will make all decisions regarding the administration of the hearing process." Ex. B, § II.G, II.G.1.

72.     The IO and the IO's report dominate and shape the Hearing Panel process. The IO presents the final report to the Panel (*see id.*); "may testify before the Panel regarding his or her investigation and may assist the DHO as needed in organizational and administrative matters related to the Panel" (*id.*, § II.G.1.vi); is interviewed by the Panel (*id.*, § II.G.2); and may be asked to provide additional evidence (*id.*). And finally, if the Panel finds the respondent

21

responsible, it must determine the appropriate sanction "*with a presumption in favor of the sanction recommended by the IO*." Ex. B, § II.G.3.i (emphasis added).

73.     Of all of the possible student conduct violations, ranging from plagiarism to shoplifting to assault to possession of weapons to misuse of University computers, only alleged sexual misconduct matters are adjudicated by a preponderance of the evidence standard while *all others* use the more stringent clear and convincing evidence standard. *Compare* Ex. D, Charter, § II.J.3.e ("Special Procedures for Sexual Misconduct Cases," stating Hearing Panel "will presume the respondent not responsible unless proven responsible by a preponderance of the evidence") *with* § II.F.5.a (requiring a "clear and convincing evidence" standard in all other cases)).

### 3.     Penn's Sexual Violence Policy.

74.     The University's Sexual Violence Policy, as provided by the investigator to John, states: "Sexual violence, relationship violence, domestic violence and stalking in any form, including sexual assault and rape, are prohibited by University policy. Sexual violence includes a range of behaviors in which an act of a sexual nature is taken against another individual without the individual's consent or when the individual is unable to consent." (Ex. A).

75.     The policy defines "sexual assault" as follows:

**Sexual assault** (including but not limited to rape) is defined as having committed any of the following acts:
• Any physical sexual contact that involves the use or threat of force or violence or any other form of coercion or intimidation;
• Any physical sexual contact with a person who is unable to consent due to incapacity or mental or physical impairment. "Incapacity" or "impairment" include but are not limited to being under the influence of alcohol or drugs or being too young to consent.

76.     Consent is defined as follows:

*Consent is an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words or actions*. Consent may not be inferred from silence, passivity or lack of resistance alone. Furthermore, consent to one form of sexual activity does not imply consent to other forms of sexual activity, and the existence of a current or

22

previous dating, marital or sexual relationship is not sufficient to constitute consent to additional sexual activity. Assent shall not constitute consent if it is given by a person who because of youth, disability, intoxication or other condition is unable to lawfully give his or her consent.

Ex. A (emphasis added).

77.     The Policy further states: "In determining whether the alleged conduct violates this policy, consideration will be given to the totality of circumstances, including the nature of the conduct and the context in which the alleged incident occurred." Ex. A.

### 4.     Penn's Promise Not to Discriminate.

78.     The University's Nondiscrimination Statement is a contractual undertaking in which the University states:  "The University of Pennsylvania values diversity and seeks talented students, faculty and staff from diverse backgrounds. *The University of Pennsylvania does not discriminate on the basis of race, color, sex*, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status or any other legally protected class status *in the administration of its admissions, financial aid, educational or athletic programs or other University-administered programs* or in its employment practices." Ex. E (emphasis added).

79.     As set forth above, the Code of Student Conduct and other University policy documents likewise assure students of their right to be free of discrimination, including discrimination based on race, color, or sex.

### B.     John's Consensual Encounter with Jane Roe.

80.     Jane demonstrated through clear words and actions, and John believed, that their sexual encounter was consensual.

81.     On the night of June 7, 2016, a mutual friend introduced John and Jane at a local bar. The friend and John invited Jane to a nearby members-only bar, at about 1:45 a.m. When

they arrived there, John purchased memberships for the friend and Jane. The friend purchased a round of beers for himself, John, and Jane. John believed the friend was drunk. John was not drunk and Jane did not appear drunk or impaired in any way.

82.     Jane flirted with John, stood close to him, and touched him.

83.     When Jane was ready to leave, she told John where she lived, which is near to where he lived, so he offered to walk her home. She responded by saying something like "that's cool."

84.     When they left the bar, John offered Jane his hand and she took it. They held hands as they walked the five to six blocks from the bar to the street where both of their houses were located. As they were walking, they stopped briefly and kissed passionately.

85.     According to the Reports, Jane acknowledges that they held hands.

86.     When Jane arrived at the intersection across the street from John's house, where he lived with others, he invited her in for "some fun." Jane said she was tired and John suggested she could join him for a few minutes.  She agreed. They then crossed the street together to get to John's house.

87.     As they walked onto the lit porch of John's house, he let go of her hand so he could use the combination lock to unlock and open the front door. As John entered through the front door, Jane followed him inside. He walked up the stairs to his room, on the second floor, and Jane followed him up the stairs and into his room.

88.     According to the investigator's interview summaries, Jane said John "gently pulled her toward the front door" and "led her upstairs and into his bedroom."

89.     Once inside John's bedroom, John and Jane started kissing again. While they were kissing, her phone vibrated with an incoming call but she ignored it. John reached over and

24

turned off the phone because he thought they were enjoying a romantic moment and the phone was distracting.

90.      When asked, John told her he had not turned off the phone. According to the investigator's interview summaries, Jane knew the phone was off but thought the battery had died. There was a phone charger on the dresser next to the bed, but Jane did not ask to use it.

91.      The kissing was followed by various consensual sexual activities between the two, including oral sex and intercourse, with John wearing a condom. At one point during intercourse Jane said she had to go to the bathroom, and the two immediately stopped. Jane left the room and then returned, and their sexual activities continued, this time without a condom. From Jane's words, sounds and actions it was evident to John that she was enjoying herself and that she was giving him signals to continue. When he asked her if they could switch positions, she said "yes."

92.      Eventually Jane said she was tired and had to go to work in the morning. They immediately stopped having intercourse. John asked if they could continue for a bit longer because he was almost finished. Jane agreed, as long as he withdrew before orgasm, which he did.

93.      John went to the bathroom and when he returned, Jane asked if he could set an alarm for her at 8:00 a.m. He did. John then turned off the light and they lay in bed naked cuddling and talking, with his arm around her and her head on his chest. They fell asleep. Jane decided to stay with John after their encounter and did not express a desire to leave or return home.

94.      According to the Reports, the last thing Jane remembered was seeing John put a retainer in his mouth.

95.     In the early morning of June 8, John was drowsy and still half asleep, but saw

Jane getting dressed and ready to leave. He did not think she saw him open his eyes, and he fell

back asleep. He was not sure precisely when Jane left. He did not remember hearing the alarm go

off, but assumed she left at 8:00 a.m. because that is the time that she had asked him to set the

alarm. He did not look at a clock or his phone to check the time.

96.     Later that day a detective assigned to Philadelphia's Special Victim's Unit

executed a search warrant at John's home on June 8, 2016. The detective told John he was there

because of allegations by Jane. John cooperated fully with the police.

## C.     The Investigative Team's Breach of the University's Contractual Promises to Afford John a Fair, Thorough, and Unbiased University Judicial Process.

97.     The University's investigation, the Draft and Final Reports, the investigative

team's conclusions, and the fundamental flaws in the process are summarized above in Section I.

98.     As set forth above, the University's investigative team failed to give John

adequate notice of the nature of the allegations against him and failed to conduct a complete and

objective investigation. The investigative team failed to provide complete transcripts of what the

parties and witnesses were asked and what they said, instead giving John access only to the

investigator's summaries and characterizations – and adding new "facts" not included in those

summaries when it suited the investigator to do so. The investigative team refused to allow John

to have copies of the documents it did have, including his own statements, which prevented him

from determining whether the documents were accurate and included all important information.

99.     While the "Statement of Charge" letter said John had been accused of "sexual

assault," the investigative team did not make a finding that John had sexually assaulted Jane, and

did not address the elements of sexual assault under the University's Sexual Violence Policy. See

Draft and Final Reports. Instead, the team found, "by a preponderance of the evidence, that the

26

Respondent violated the University's Sexual Violence Policy by engaging in intercourse with the Complainant without her consent." Draft Report, p.13; Final Report, p.13.

100.    In reaching this finding, the investigative team incorrectly interpreted and applied the University's Sexual Violence Policy, which states that consent is "an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words *or actions*" (emphasis added), by concluding that Jane did not give consent because she told them she "never said 'yes,' was never asked, and never initiated sexual contact." Draft Report, p.13; Final Report, p.13.

101.    The team failed to inform John when it switched its focus from sexual assault to affirmative consent, failed to inform him of its narrow and incorrect interpretation of what constitutes affirmative consent under the University's policy, failed to interview John thoroughly about the facts relevant to affirmative consent, and unfairly discredited John's evidence that Jane did say "yes" several times and expressed consent through enthusiastic participation in sexual conduct.

102.    The team also misrepresented John's statements to further bolster its finding that Jane had not consented. For example, on page 13 of both Reports, the team states that John's "own version of the events that transpired on June 8" show a violation of the University's Sexual Violence Policy. The last paragraph on the page is presented as John's version, but the team combines alleged statements by John, alleged statements by Jane, and the team's own characterizations, without any meaningful distinction. In the middle of the paragraph the team states: "The Complainant never reciprocated by volunteering to do any intimate acts such as undress herself, undress the Respondent, or perform fellatio on him." The source of that

27

conclusion is not clear from the paragraph itself, and nothing in the interview notes shows that the team asked those specific questions of either Jane or John.

103.    Indeed, the sentence quoted above is followed immediately by Jane's acknowledgment that she "cooperated," which the team explains away by saying she did this to end the encounter faster, without addressing how John could know her purported motivation. Final Report, p.13.

104.    Because John and Jane were alone during their sexual encounter and there were no other direct witnesses, credibility was a crucial issue. As set forth above, however, the investigative team applied inconsistent standards to John and Jane, and ignored or tried to explain away information that impugned Jane's credibility.

105.    The investigative team changed Jane's statements to bolster their conclusion that John was an aggressor. According to the investigator's interview summary, Jane told the investigator John had "*gently* pulled her toward the front door" and "*led* her upstairs and into his bedroom," but the Reports stated he had "pulled her toward the front door" and "pulled [her] upstairs into his bedroom," thereby adding an element of force where it was absent. Draft Report, p. 9, 10, 12, 18; Final Report, p.9, 10, 12, 18.

106.    After John pointed out this discrepancy, the investigative team revised the report in one place to state that he "led" her to his bedroom, but left in their Findings of Fact that he had "pulled" her to his bedroom and onto his bed. Final Report, p.10, 12, 18.They also did not add the word "gently" as John had requested *and which appeared in their own notes immediately before the words they did quote in their Report*. Final Report, p.9.12. Their language and omissions fundamentally changed Jane's statement to John's detriment, were unfair, and reflect a bias against him.

28

107.    The investigative team failed to discredit Jane as a result of her false report to police that John had forcibly pulled her into his house by her hair, arm and neck. When John pointed this out, the investigative team changed the Final Report to suggest that she had given them the same information she had given the police, and thereby to further bolster their stereotype of him as a violent aggressor. That was not in the investigator's notes and was inconsistent with what the notes did say – that John "gently pulled" Jane toward the house.

108.    The investigative team applied very different standards to John than to Jane, going to great lengths to undermine his credibility and bolster hers.

109.    According to the investigative team, John was "not credible with regard to material matters" because he said Jane left his house after 8:00 a.m. on June 8, while Jane said she left around 6:30 a.m. But the precise time she left was not material to anything and John made clear he did not know exactly when she left. As John explained to the investigative team, he must have mistakenly assumed that Jane left his home around 8:00 a.m. because that is the time of the alarm she instructed him to set. The material fact, which is not in dispute, is that after their sexual encounter, Jane spent the night with John and did not leave until sometime in the morning. Final Report, p. 10, 12.

110.    In addition, the Report inexplicably said John was "dishonest when he told the investigative team he never got out of bed and watched the Complainant dress and then leave"; both John and Jane said he did not get out of bed. Final Report, p. 14.

111.    The investigative team also drew unsupported and unwarranted conclusions from the fact that John had turned off Jane's phone and then told her he had not. Final Report, pp. 14-15. John honestly acknowledged that he had done this, explained that he and Jane were in the middle of a romantic moment, and pointed out that Jane always had access to her phone. Jane

29

acknowledged that she knew her phone was off but believed that the battery died, and that the phone was in plain sight on the bedside table. There was a phone charger on the bedside table and Jane did not ask to use it.

112.    Other than these so-called credibility issues, the team offered no explanation for accepting Jane's word over John's, including the conclusions in its "findings of fact" that the parties did not kiss, that they did not have oral sex, and that Jane told John to stop and tried to push him away.

113.    The team also bolstered Jane's claims with information from two witnesses who did not have first-hand knowledge of the critical facts, without acknowledging facts that showed those witnesses were biased and unreliable.

114.    One of those witnesses was Jane's roommate and sorority sister, whom the investigative team called Witness # 2. According to the Reports, Witness #2 studied abroad during the 2016 spring semester. She returned to Philadelphia after 2 a.m. the morning of the alleged assault, June 8, 2016. Jane had told Witness #2 she would be home to let Witness #2 into the house because Witness #2 did not have her house key. However, Jane was not home as planned when Witness #2 arrived. As a result, Witness #2 stayed outside all night and was still waiting outside when Jane arrived home after leaving John's house. Witness #2 said she called Jane on June 8 at 2:32 a.m., that Jane did not answer, and that Jane arrived home between 6:30 and 7:00 a.m. Final Report, pp.6-7

115.    The investigative team obtained and examined text messages Witness #2 exchanged with Jane on the night in question. Witness #2 sent Jane a message on June 8 at 3:02 a.m. with Jane's real name in all capital letters, and a message at 3:28 a.m. saying "I'm gonna

30

kill you." According to the report, Jane received these two texts at 6:49 a.m. The investigators concluded that was the time she had turned her phone on. Final Report, pp.14-15.

116.    According to the Reports, Witness #2 thought Jane looked "upset" and "tired," and asked Jane where she had been. Jane said she had been at "some asshole's place."

117.    According to the investigator's interview notes, but omitted from the Reports, Jane went inside the house to charge her phone and then saw the text messages from her roommate that she had not seen when she was with John, including the "I'm gonna kill you" text.

118.    According to the Reports, Witness #2 then found Jane crying and asked her if she had been raped, and Jane answered "yes." Final Report, p.7.

119.    The investigative team used Witness #2's statements about Jane's words and demeanor to support Jane's version of events. Final Report, p.17.

120.    The team failed, however, to acknowledge Jane's motive to fabricate a story after she learned that her roommate had been waiting outside their home for hours in the middle of the night and saw the angry text messages.

121.    The team also failed to adequately consider the bias of Witness #2 based on her close relationship with Jane. Both are members of a sorority whose members, according to their website, are bound by promises to demonstrate sisterhood and friendship throughout life, and remain loyal to the sorority through an unwavering devotion and steadfast allegiance. Further, since Witness #2 suggested the idea of rape to Jane, Witness #2 may have some political or other investment in bolstering Jane's story.

122.    The investigative team also failed to consider or discuss text messages Jane sent to Witness #2 that undermine her claim that she was assaulted. On June 8, at 8:40 a.m., Jane sent iMessages to Witness #2 asking, "Are you awake?" and "Do you want to come hang for 5

31

minutes lol?" The term "lol" commonly means "laugh out loud." These messages were sent two hours *after* Jane allegedly told Witness #2 she had been assaulted. It appears the investigative team failed to ask Jane or Witness #2 about this message or the state of mind it revealed, and also failed to investigate whether there were other communications by Jane relating to her state of mind or motive to fabricate.

123.    The team also gave improper weight to the statement of another witness without direct knowledge of Jane and John's encounter. According to the Reports, Witness #1, a mutual friend who introduced John and Jane the night of June 7, said he did not see Jane flirt with John. The team did not, however, account for Witness #1's concession that he was "pretty buzzed" or report asking him any questions about his alcohol intake that night, and apparently did not even ask if he was with them the entire time (which he was not). Final Report, p.8.

124.    The investigative team failed to obtain video recordings from the bars where John and Jane had been, or any video recordings that may have captured John's walk home with Jane, that may have shown Jane flirting with John, holding his hand, and kissing him.

125.    While John pointed out these issues in his response and Supplemental Statement to the Draft Report, the investigative team failed to correct or clarify the Final Report.

126.    After the Final Report was issued, John learned of yet another error in the investigative team's factual summary. The Report stated that on June 8, Jane went with Witness #2 to the Women's Center, Special Services, and the Police Department. In comments to the Report, however, Jane said she actually went to those places with a different friend, one of the women she had been with the previous night. This further demonstrates how slipshod the investigation was. The team misstated an important fact, placed weight on the account of the roommate who had not been with Jane on the night in question, and failed to interview the

person who was with her both that night and the next morning. John – and the Hearing Panel cannot know what other errors the investigation team may have made.

127.     The investigative team's conduct and the changes they did make in the Final Report demonstrated that they were looking to bolster Jane's story and their own pre-existing conclusions, and not looking for the truth.

128.     The University, through its agents and employees, violated the obligation to provide John with "the right to fair University judicial process," free of prejudice and bias, and violated John's contractual rights and the University's contractual obligations in multiple ways to John's severe detriment.

129.     The flaws in the investigation and Reports have irreparably tainted the disciplinary process and there is no chance for John to get a fair hearing given that the Final Report will be the foundation upon which the hearing process and any subsequent proceedings will be based.

130.     The Disciplinary Hearing Officer (DHO) has refused to admit evidence that John passed a polygraph examination, even though the polygraph results are part of John's objections to the Final Report and the DHO does not have discretion to exclude them. *See* Ex. B, Disciplinary Procedures, § II.E.2. ("The complainant and respondent may submit formal objections or comments to the final report, which *will* become part of the final report of the matter.") (Emphasis added). In the Final Report, the investigative team discredited John on all factual matters material to the disciplinary investigation, and John should have been permitted to submit his polygraph results to rehabilitate his credibility as to those issues.

## COUNT I
### (Breach of Contract)

33

131.    John incorporates each of the paragraphs in this Complaint as if fully set forth herein.

132.    At all times relevant hereto, a contractual relationship existed between the University and John through the University's policies and procedures governing the Student Disciplinary System, including but not limited to the provisions of the Code, the Charter, the Disciplinary Procedures, the Sexual Violence Policy, and the Nondiscrimination Statement.

133.    Through the documents it publishes and provides to students, the University makes express contractual commitments to students involved in a disciplinary process.

134.    The University promises students "a process that is fundamentally fair, and free of bias or prejudice." Disciplinary Procedures, § II.B.1 (Ex. B); see also Code of Conduct (Ex. C); Charter, § I.A (Ex. D).

135.    The University promises to treat students "with respect, dignity, sensitivity, and fairness throughout the entire process." Disciplinary Procedures, § II.B.2.

136.    The University promises students "will be informed about the process both before the process is initiated and throughout the process as it unfolds." *Id.*

137.    The University promises "a thorough and fair investigation," which must include "interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence." *Id.*, § II.D.

138.    The University promises students will not be discriminated against based on race, color or sex. *See, e.g.*, Code (Ex. C); Nondiscrimination Statement (Ex. E).

139.    The University, through its investigators, was required to act in accordance with its policies and procedures and Nondiscrimination Statement in notifying John of Jane's allegations, the University's charges, and the specific facts alleged to have given rise to the

34

charges; in addressing Jane's allegations against John; in conducting its investigation; in applying the provisions of the Sexual Violence Policy, in making the decision whether to file charges against John; in adjudicating the charges; and in deciding on sanctions.

140.    For all the reasons set forth above, the University has materially breached its contracts with John by failing to provide "a process that is fundamentally fair, and free of bias or prejudice," failing to give adequate notice, failing to perform a fair, thorough, and nondiscriminatory investigation, and failing to comply with its policies and procedures and Nondiscrimination Statement.

141.    In addition to the explicit, contractual obligations between the University and John referred to throughout this Complaint, there is an implied duty of good faith and fair dealing in the contracts between the University and John, which was violated repeatedly as a result of the acts and omissions described herein.

142.    As a direct, proximate and foreseeable consequence of the University's numerous material breaches of contract, John has suffered monetary damages and other direct and consequential damages.

143.    John is entitled to recover damages for the University's breach of its contractual obligations and duties.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.

## COUNT II
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.)**

144.    John incorporates each of the above paragraphs as if fully set forth herein.

35

145.     Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–1688,

provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

146.     Title IX applies to all public and private educational institutions that receive

federal funds, including colleges and universities. The University is a recipient of federal funds

and, therefore, is bound by Title IX and its regulations.

147.     Title IX is enforceable through an implied right of action affording an individual

discriminated against due to his or her gender pecuniary damages and equitable relief.

148.     Under Title IX, schools must "[a]dopt and publish grievance procedures

providing for the ***prompt and equitable resolution of student . . . complaints*** alleging any action

which would be prohibited by [Title IX or its regulations]." 34 C.F.R. § 106.8(b) (emphasis

added).  Both the Department of Education and Department of Justice have set forth this

requirement by way of regulation. *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. §

54.135(b) (Dep't of Justice).

149.     In 2001, the Office for Civil Rights ("OCR") of the Department of Education, the

office that administratively enforces Title IX, promulgated regulations pursuant to notice-and-

comment rulemaking in a document entitled "Revised Sexual Harassment Guidance:

Harassment of Students by School Employees, Other Students, or Third Parties" ("2001

Guidance"). Available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf (last

viewed September 18, 2016). Title IX's regulations, including the 2001 Guidance, have the force

and effect of law, because they affect individual rights and obligations and were the product of

notice-and-comment rulemaking.

150.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable. . . ." *Id.* at 20. These elements apply to private and public colleges and universities and include:

> "*Notice to students . . . of the [school's] procedure*"

> "*Adequate, reliable, and impartial investigation of complaints*, including the *opportunity to present witnesses and other evidence*"

*Id.* (emphasis added).

151.    OCR's 2001 Guidance further stated that *"according due process to both parties involved, will lead to sound and supportable decisions*." *Id.* at 22 (emphasis added).

152.    Title IX bars the imposition of university discipline where gender is a motivating factor.

153.    Both on their face and as applied in this case, the University's Disciplinary Procedures violate Title IX. The violations include, but are not limited to, engaging in selective enforcement and reaching an erroneous outcome.

154.    Throughout the disciplinary process, the University treated John unfairly because of his sex, including, among other things, by failing to give John proper notice of the charges against him; failing to given him basic due process protections such as the right to confront his accuser, to receive copies of relevant evidence, and to present witnesses and other evidence on his own behalf; and by conducting an inadequate, unreliable, and biased investigation of the complaint against him.

155.    The investigative team's one-sided investigation demonstrated pervasive gender bias against John and in favor of Jane.

156.    The investigative team's apparent view of males as aggressors is consistent with a blatantly biased document co-authored by Penn's General Counsel, the then-Director of the

37

Office of Student Conduct, the head of Penn's Women's Center, and a consultant, which

identifies female complainants as "victims" and accused male students as "assailants" who

"scout[ ] the campus for naïve young women." *See* "Sexual Misconduct Complaints: 17 Tips for

Student Discipline Adjudicators" (http://www.legalmomentum.org/resources/guide-university-

discipline-panels-sexual-violence) (last viewed September 18, 2016). The 17 Tips were intended

to be used to train faculty and staff Hearing Panel members and advisors about the disciplinary

process. The creation and authorship of the document is indicative of intentional and institutional

gender bias. It is freely available on the University's website, and the University has never

disavowed it.

157.    In the context of sexual assault cases, the Disciplinary Procedures' deficient

process is deliberately designed to subject male students as a group to less favorable treatment

than female students, because accused students in sexual assault cases are overwhelmingly, if not

always, male, and the Disciplinary Procedures on their face and as implemented by the

University intentionally accord unequal treatment to them.

158.    The Disciplinary Procedures as conceived and implemented by the University are

deliberately designed to favor the female accuser and disfavor the male accused by, among other

things, eliminating from the process the most fundamental procedural safeguards for the accused.

159.    The Disciplinary Procedures have been the subject of criticism within the

University, including by Penn Law professors. *See* above, paragraphs 40-43.

160.    The Disciplinary Procedures were developed in an effort to appear tough on the

so-called campus rape culture.

161.    The University's implementation of its Disciplinary Procedures continues to be

impacted by pressure from students and others who claim the University does not take

38

sufficiently seriously the complaints of female students about alleged sexual assaults by male students.

162.    For instance, in June of 2016, The Daily Pennsylvanian published an article titled "Advocacy Groups Worry About a Penn Brock Turner," referring to the notorious case of a student sentenced to six months in jail after being found guilty of sexually assaulting an unconscious woman. According to the article, "campus leaders at Penn involved in communities of sexual violence survivors were not surprised" by how the Turner case was handled, saying that "'[t]he short sentence and the victim blaming [is] . . . just what we've always seen.'" The students interviewed found similarities between Stanford and Penn and how sexual assaults are handled. "'It's a good thing that people are standing up and getting angry and realizing that there needs to be a shift in rape culture, especially towards those who were more lenient and supportive of Brock,'" one student said. "All students were emphatic that the incident was not isolated to Stanford." (http://www.thedp.com/article/2016/06/advocacy-groups-worry-about-a-penn-brock-turner) (last viewed September 18, 2016).

163.    In the fall of 2015, the University released its results from a sexual assault climate survey conducted by the American Association of Universities. The Daily Pennsylvanian, a student run campus newspaper, reported that "[a]lmost a third of Penn's female undergraduates say they've been sexually assaulted," and that "[t]he rate of victimization among undergraduate females was five times higher than that of undergraduate males." It also reported the response by Penn's President and Provost: "The survey results confirm our deepest concerns, and we write to you now to say that we are therefore redoubling our efforts . . . . We must not and we will not rest until we effectively tackle this problem as a campus community." "Administration finds results of AAU sexual assault climate survey 'deeply troubling'" (Sept. 21, 2015)

(http://www.thedp.com/article/2015/09/aau-sexual-assault-climate-survey) (last viewed
September 18, 2016).

164.     The article, however, misstated the survey results: the figures applied to students
who responded, not to the student population as a whole. 6,402 students responded out of the
total of 23,789 students invited to take the survey. Of those respondents, 1,902 were female
undergrads and 1,305 were male undergrads. *See* "University Report on the AAU Campus
Climate Survey on Sexual Assault and Sexual Misconduct," p.3
http://www.upenn.edu/ir/surveys/AAU/Report%20and%20Tables%20on%20AAU%20Campus
%20Climate%20Survey.pdf (last viewed September 18, 2016).

165.     The "Student Guidelines for the University of Pennsylvania Sexual Violence
Policy," created by the Penn Women's Center, further reflect and perpetrate gender bias by
referring to complainants as "victims/survivors" who have experienced personal trauma.
(http://www.vpul.upenn.edu/ofsl/files/Penn_Sexual_Violence_Policy_Guidelines.pdf) (last
viewed September 18, 2016).

166.     Information concerning the outcome of disciplinary proceedings involving male
students as compared to female, and African American students as compared to other students, is
in the exclusive possession and control of the University. John asked the University investigator
for information concerning the "applicable University precedent" referenced in the Reports as a
basis for the sanctions against him, and other information and statistics regarding student
disciplinary procedures and sanctions, but the investigator flatly refused.

167.     Upon information and belief, statistics within the exclusive possession and control
of the University will show a pattern of intentional discriminatory conduct and selective
enforcement.

Case 2:16-cv-05088-JP   Document 1   Filed 09/23/16   Page 41 of 51

168.     The University's institutionalized gender bias against males accused of sexual assault results from classifications based on archaic assumptions. The University treats female complainants differently than male respondents based on the University's outdated attitudes about females and overbroad generalizations about male and female sexual traits and behaviors.

169.     The outcome of the University's flawed proceeding against John was clearly erroneous, and was motivated on the basis of sex. The University was on notice of, and was deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infused the process. The implementation of the Disciplinary Procedures was motivated by and premised on archaic assumptions and stereotypical notions of the sexual behavior of male and female students – *i.e.*, male students are perceived as sexual aggressors and perpetrators and female students are perceived as sexual victims.

170.     The University's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

171.     The University has threatened to punish John with its most severe sanction – expulsion and a permanent record of the alleged violation – with little evidence and as a result of a process that contains virtually no procedural safeguards for accused students and is permeated with gender bias.

172.     As a direct, proximate, and foreseeable consequence of the University's aforementioned Title IX violations, John has sustained and will continue to sustain significant damages, including, but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

41

173.    As a result of the foregoing, John is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, injunctive relief, attorneys' fees, expenses, costs and any other appropriate relief.

## COUNT III
### (Negligence)

174.    John incorporates each of the above paragraphs as if fully set forth herein.

175.    The University owes duties of care to John independent of its contractual duties, including, without limitation, a duty of reasonable care in selecting, training and supervising investigators to implement the Disciplinary Procedures.

176.    The University breached its duties of care owed to John by failing adequately to select, train and supervise the investigative team and thereby allowing it to conduct a sham investigation, discriminate against John based on gender and racial stereotypes, produce flawed and biased Reports, and reach unwarranted and erroneous conclusions.

177.    As a direct, proximate, and foreseeable consequence of the University's negligence, John has sustained and will continue to sustain significant damages, including, but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of

Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, injunctive relief, attorneys' fees, expenses, costs and any other appropriate relief.

## COUNT IV
### (Intentional Infliction of Emotional Distress)

178.    John incorporates each of the above paragraphs as if fully set forth herein.

179.    The acts and omissions of the University and its investigators were willful and intentional.

180.    The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause John severe emotional distress.

181.    The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

182.    The University's conduct and that of the investigators was the direct and proximate cause of John's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

183.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, John sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.

43

## COUNT V
### (Negligent Infliction of Emotional Distress)

184.    John incorporates each of the above paragraphs as if fully set forth herein.

185.    The acts and omissions of the University and its investigators were negligent.

186.    The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause John severe emotional distress.

187.    The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

188.    The University's conduct and that of the investigators was the direct and proximate cause of John's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

189.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, John sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.

## COUNT VI
### (Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S. § 201-1, *et seq.*)

190.    John incorporates each of the above paragraphs as if fully set forth herein.

44

191.   At all relevant times, the University offered for sale to the public educational goods and services.

192.   At all relevant times, John was a purchaser of educational goods or services for personal, family or household purposes.

193.   In connection with the sale of its educational goods and services and collection of tuition, fees and costs related thereto, the University committed various unfair and deceptive acts and practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S. § 201-1, *et seq*. ("UTPCPL"), including, but not limited to the following acts, omissions, warranties, and misrepresentations:

   a.   Representing to John in its written policies and procedures that the University would provide "a process that is fundamentally fair, and free of bias or prejudice," the right to be treated "with respect, dignity, sensitivity, and fairness throughout the entire process," "the right to fair University judicial process in the determination of accountability for conduct," and "a fair and effective mechanism for investigating and resolving disputes involving students and alleged violations by students of the University's rules, regulations, and policies," when in fact the University would not and did not do so;

   b.   Representing to John in its written policies and procedures that the University would inform students "about the process both before the process is initiated and throughout the process as it unfolds," when in fact the University would not and did not do so;

   c.   Representing to John in its written policies and procedures that the University would conduct " a thorough and fair investigation," which must include "interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence," when in fact the University would not and did not do so;

   d.   Representing to John in its written policies and procedures that the University ensures its "Student Disciplinary System functions fairly and in furtherance of the educational mission of the University," when in fact the University would not and did not do so;

   e.   Representing to John in its written policies and procedures that the University would follow the rules associated with its Student Disciplinary

45

System and Sexual Violence Policy, when in fact the University would not and did not do so;

f. Representing to John in its written policies and procedures that University leadership would provide appropriate oversight over investigators and the student disciplinary process overall, when in fact the University would not and did not do so;

g. Not informing John in its written policies and procedures that the University would conceal, misrepresent, or exaggerate evidence relevant to its Student Disciplinary System and Sexual Violence Policy, when in fact the University would and did do so;

h. Representing to John that he would not be discriminated against, treated unequally compared to female students, or mistreated as a result of his male gender or his African American race and color, when in fact the University would and did do so.

194.    John relied upon the various acts, omissions, warranties and misrepresentations of the University in entering into a contractual agreement with the University upon his matriculation and continuing to make tuition and other payments to the University while a student.

195.    The University's unfair and deceptive conduct constituted false representations of the characteristics and benefits of the University's educational goods and services; constituted false representations that the University's educational goods and services were of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or warranty; advertised educational goods and services with the intent not to sell them as advertised; and was fraudulent and deceptive conduct which created a likelihood of confusion and misunderstanding – all within the meaning of § 201-2 (4)(v), (vii), (xiv), and (xxi) and § 3 of the UTPCPL, and each of which was the proximate cause of damages and physical, emotional, and financial harm to John.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for the following relief:

46

(a) Find, determine and declare that the University's business practices violate the UTPCPL;

(b) Award actual and statutory damages, including restitution, treble damages, attorney fees and costs;

(c) Grant any other appropriate relief.

## COUNT VII
### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

196.   John incorporates each of the above paragraphs as if fully set forth herein.

197.   Title VI, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination on the basis of race, and color in programs and activities receiving federal financial assistance.

198.   The University is the recipient of federal financial assistance.

199.   John is a member of a protected minority class.

200.   The acts and omissions of the University, which include acts and omissions of the University's agents and employees, violated John's rights under Title VI by discriminating against him on the basis of race.

201.   On information and belief, the University treated John differently based on his race than similarly situated students who were not members of a protected class.

202.   University officials had actual notice that discrimination based on race was so severe, pervasive, and objectively offensive that it deprived John of access to educational programs, activities, and opportunities.

203.   The University and its policymakers, officials and other employees, exhibited deliberate indifference to the discrimination of John based on race in violation of Title VI.

204.   The University's violations of Title VI were the actual, direct, and proximate cause of the adverse actions suffered by John as alleged.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of

Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.

## COUNT VIII
### (Violation of 42 U.S.C. § 1981)

205. John incorporates each of the above paragraphs as if fully set forth herein.

206. 42 U.S.C. § 1981, as amended by Section 101 of the Civil Rights Act of 1981, ensures the fundamental right to contract and to full and equal benefit of all laws.

207. Section 1981 states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

208. A contractual relationship existed between John and the University.

209. The acts and omissions of the University, which include acts and omissions of the University's agents and employees, violated John's rights and interfered with the enforcement and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship by discriminating against him on the basis of race.

210. The University's violations of 42 U.S.C. § 1981 were the actual, direct, and proximate cause of injuries suffered by John as alleged.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.

48

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court:

a. Immediately stop the ongoing disciplinary process;

b. Allow John to continue to remain on campus as a member in good standing of the University community;

c. Order the University to set aside the investigative team's finding that John violated the University's Sexual Violence Policy and the sanctions of expulsion and notation on his records;

d. Require the University, if it wishes to proceed with a disciplinary process, to appoint a new, independent investigator from outside the University to determine whether there is sufficient basis to conduct a full investigation and, if so, to conduct a fair and complete investigation, including addressing the issues raised by John in this Complaint;

e. Order that the University may not use any information or materials generated by the investigative team, including the Reports and the interview summaries and notes, in any disciplinary process regarding John, and must destroy all such materials;

f. Require the University to change the Disciplinary Procedures to be consistent with due process;

g. Award John compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

h. Award prejudgment interest;

i. Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award;

j. Grant such other and further relief that the Court deems just and proper.

## Demand for Jury Trial

John Doe respectfully requests and demands a jury trial on all issues so triable.

Dated: September 21, 2016                    Respectfully submitted,

Patricia M. Hamill, Esq. (I.D. No. 48416)
phamill@conradobrien.com
Conrad O'Brien, P.C.
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, Pennsylvania 19102
(215) 864-9600

*Attorney for Plaintiff John Doe*

49

## **VERIFICATION**

I, John Doe, hereby verify that I have read the foregoing Complaint and verify that all of the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _9/22/16_                     _John Doe_
                                      John Doe