

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE, | : |
| Plaintiff, | : Civil Action No._____ |
| v. | : |
| THE TRUSTEES OF THE UNIVERSITY<br>OF PENNSYLVANIA, a Pennsylvania<br>Non-Profit Corporation, | : **16 5088** |
| Defendant. | : |

## ORDER

AND NOW, this \_\_\_\_\_ day of September, 2016, upon consideration of Plaintiff John

Doe's Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff's Verified

Complaint, and all documents submitted in support thereof and in opposition thereto, and after a

hearing in open court, it is ORDERED as follows:

1.    Plaintiff's Motion for a Temporary Restraining Order is GRANTED;

2.    Defendant and its officers, agents, servants, employees, and attorneys

      (collectively, "Defendant") are hereby RESTRAINED AND ENJOINED as

      follows:

      a.    Defendant shall immediately stop the ongoing disciplinary process;

      b.    Defendant shall not take any action to prevent Plaintiff from continuing to
            remain on campus as a member in good standing of the University
            community;

      c.    Defendant shall expunge the investigative team's finding that Plaintiff
            violated the University's Sexual Violence Policy and the threatened
            sanctions of expulsion and notation on his records;

d. If Defendant wishes to proceed with a disciplinary process, Defendant shall appoint a new, independent investigator from outside the University to determine whether there is sufficient basis to conduct a full investigation and, if so, to conduct a fair and complete investigation, including addressing the issues raised by Plaintiff in his Verified Complaint;

e. Defendant shall not use any information or materials generated by the investigative team, including the Reports and the interview summaries and notes, and shall destroy all such materials.

3. Defendant is ordered to SHOW CAUSE why Plaintiff's Motion for Preliminary

Injunction should not be granted at a hearing scheduled for _____

_____, 2016, at _____ a.m./p.m. in Courtroom ____, James A.

Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106.

4. Defendant is ORDERED to preserve and retain all documents and electronically

stored information potentially relevant to the claims in the Verified Complaint;

5. This Order shall remain in full force and effect until the hearing on Plaintiff's

Motion for Preliminary Injunction;

6. The Court FINDS that no compensable harm will result to Defendant as a result

of this Order, and, therefore, the Court declines to assess any surety bond; and

7. This Order shall become effective immediately.

IT IS SO ORDERED.

_____
U.S. District Judge

2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE, | : |
| | : |
| Plaintiff, | : Civil Action No._____ |
| | : |
| v. | : |
| | : |
| THE TRUSTEES OF THE UNIVERSITY | : |
| OF PENNSYLVANIA, a Pennsylvania | : |
| Non-Profit Corporation, | : |
| | : |
| Defendant. | |

**16   5088**

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65**

Plaintiff John Doe hereby moves this Honorable Court pursuant to Federal Rule of Civil

Procedure 65 for an Order temporarily restraining and preliminarily enjoining Defendant

University of Pennsylvania from conducting further disciplinary proceedings against Plaintiff

related to the complaint made against him under the University's Sexual Violence Policy as well

as from imposing or implementing any sanction resulting therefrom.  Specifically, Plaintiff

moves for an Order restraining and enjoining Defendant as follows:

      a.    Defendant shall immediately stop the ongoing disciplinary process;

      b.    Defendant shall not take any action to prevent Plaintiff from continuing to remain on campus as a member in good standing of the University community;

      c.    Defendant shall expunge the investigative team's finding that Plaintiff violated the University's Sexual Violence Policy and the threatened sanctions of expulsion and notation on his records;

      d.    If Defendant wishes to proceed with a disciplinary process, Defendant shall appoint a new, independent investigator from outside the University to determine whether there is sufficient basis to conduct a full investigation and, if so, to conduct a fair and complete investigation,

1

including addressing the issues raised by Plaintiff in his Verified Complaint;

e.      Defendant shall not use any information or materials generated by the investigative team, including the Reports and the interview summaries and notes, and shall destroy all such materials.

Counsel for Plaintiff has notified Defendant of Plaintiff's intent to file this Motion today and has provided it with a copy of the Verified Complaint, this Motion, and the supporting Memorandum of Law on September 22, 2016.  In support of his Motion, Plaintiff incorporates by reference his Verified Complaint and his Memorandum of Law filed herewith.

WHEREFORE, Plaintiff respectfully requests that the Court grant his Motion for a Temporary Restraining Order and Preliminary Injunction as outlined in the attached proposed order, and for such other relief as the Court finds just and proper.

Dated: September 23, 2016

Respectfully submitted,

Patricia M. Hamill (Pa. Id. No. 48416)
CONRAD O'BRIEN PC
1500 Market Street
Centre Square – West Tower, 39th Fl
Philadelphia, PA 19102-1921
(t) (215) 864-9600
(f) (215) 864-9620
(e) phamill@conradobrien.com

*Attorneys for Plaintiff John Doe*

2

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the University of

Pennsylvania through its attorneys James A. Keller by hand delivery on September 22, 2016.

3

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,                 :
                                 :
           Plaintiff,         :    Civil Action No._____
                                   :
       v.                              :
                                   :
THE TRUSTEES OF THE UNIVERSITY   :
OF PENNSYLVANIA, a Pennsylvania    :
Non-Profit Corporation,          :

             Defendant.

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff John Doe has moved under Fed. R. Civ. P. 65 for a Temporary Restraining

Order and Preliminary Injunction against Defendant The Trustees of the University of

Pennsylvania. In June of 2016, John, an African American male student at the University, had a

consensual sexual encounter with Jane Roe, a white female student. John now stands on the

brink of expulsion from the University for alleged violation of its "Sexual Violence Policy," with

a permanent stain on his record. The internal University "investigation" that led to this result was

so tainted by ineptitude, preconception, and bias that it violated John's contractual and legal right

to a fair disciplinary process and leaves him no choice but to seek relief from this Court. Because

the sham investigation and the investigative team's "Final Investigative Report" will be the

foundation for any further internal University proceedings in this case, any attempt to further exhaust University remedies would be futile.[1]

John has filed a Verified Complaint against the University seeking damages and injunctive relief. While he is entitled to relief on all counts, he moves for immediate relief only as to his claims for breach of contract and violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, which bars the imposition of university discipline where gender is a motivating factor. John asks this Court to order the University to halt the disciplinary process and set aside both the finding that John violated the University's Sexual Violence Policy and the threatened sanctions, and for other relief as set forth below.

John satisfies all the prerequisites for immediate injunctive relief.

First, John will likely succeed on the merits of his breach of contract and Title IX claims. Under the University's contractual promises and the law, John had the right to a fair and unbiased disciplinary procedure. He did not receive it. Instead, the University's investigative team, in perpetuation of a stereotype of "young-African-American-male-as-aggressor," failed to give him proper notice, rewrote Jane's account of events to support the team's desired conclusion, disregarded Jane's false statement to police, ignored Jane's motive to fabricate a story, overlooked the bias of "witnesses" who were not actually witnesses to the alleged encounter, fixated on immaterial details in an effort to discredit John, and unfairly distorted and misapplied the University's own definition of "consent."

---

[1] Contemporaneously with the filing of this Motion and his Verified Complaint, Plaintiff has filed a Motion for Permission to Proceed Under Pseudonym, seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein and to comply with the University's requirement that disciplinary proceedings be kept confidential. "Jane Roe" is the female complainant in the underlying disciplinary proceeding.

Second, John has suffered, and will continue to suffer, irreparable harm. He is threatened with expulsion, the interruption of his college education partway through his senior year, and the permanent record of "sexual violence" on his transcript. He will lose his ability to earn a college degree, career and graduate opportunities he would otherwise have had, and other intangible benefits of being part of the University community. While he fully expects to win this case on the merits, he will never get back what he has lost. The University has already damaged his ability to fulfill his academic and athletic commitments. If he is expelled, he will have a gap in his schooling that he will need to explain, even if he is ultimately reinstated. Even if justice ultimately prevails and his name is formally cleared, he will never be able to escape the stigma.

Third, the harm to John if the relief he requests is denied is far greater than any harm to the University that could result from granting that relief.

Fourth, the public has an undeniable interest in ensuring that the University's wrongful, inequitable, and discriminatory conduct is enjoined.

## I.   FACTUAL BACKGROUND

The facts of this case are set forth in detail in John's Verified Complaint. To avoid undue repetition, John will summarize the facts only briefly here, but respectfully suggests that the entire Complaint should be reviewed to get a full picture of what happened and how his contractual and legal rights were violated.

### A.   The Parties' Consensual Sexual Encounter and Jane's Complaint

On June 8, 2016, John and Jane, both rising seniors at the University of Pennsylvania, had a consensual sexual encounter. As set forth in the Verified Complaint, Jane affirmatively

3

consented to having intercourse with John through her clear words and actions.[2] Jane later made

a complaint about John to the University's Office of the Sexual Violence Investigative Officer.[3]

### B.    John's Contractual and Legal Right to a Fair and Unbiased Disciplinary Process

The University's policies and procedures governing student discipline in general, and

sexual misconduct complaints in particular, are publicly available on its web site and are

provided to students.[4] As applicable here, John has the right:

- To "a process that is fundamentally fair, and free of bias or prejudice."[5]

- To "be treated with respect, dignity, sensitivity, and fairness throughout the entire process."[6]

- To "be informed about the process both before the process is initiated and throughout the process as it unfolds."[7]

---

[2] Verified Complaint, ¶¶ 5, 80-95.

[3] Verified Complaint, ¶ 11.

[4] Verified Complaint, ¶¶ 56-79.

[5] University of Pennsylvania, "Student Disciplinary Procedures For Resolving Complaints of Sexual Assault, Sexual Violence, Relationship Violence and Stalking" [hereinafter "Disciplinary Procedures"], II.B.1 (https://provost.upenn.edu/policies/pennbook/2015/02/18/student-disciplinary-procedures-for-resolving-complaints-of-sexual-assault-sexual-violence-relationship-violence-and-stalking) (Ex. B to Verified Complaint); *see also* "Code of Student Conduct" (https://provost.upenn.edu/policies/pennbook/2013/02/15/code-of-student-conduct) (Ex. C) (promising a "fair University judicial process"); "Charter of the University of Pennsylvania Student Disciplinary System," § I.A (https://secure.www.upenn.edu/osc/pages/charter.html) (Ex. D) (promising a "fair and effective mechanism for investigating and resolving disputes involving students and alleged violations by students of the University's rules, regulations, and policies.").

[6] Disciplinary Procedures, II.B.2.

[7] Disciplinary Procedures, II.D.

4

- To "a thorough and fair investigation," which must include "interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence."[8]

- Not to be discriminated against based on race, color or sex.[9]

As set forth in more detail below (Section II.A.2), federal law also guarantees John the right to a disciplinary process that is not tainted by gender bias.

### C.   The University's Failure to Follow Its Own Contractual Procedures

#### 1.   The University Gave John Inadequate Notice and Misapplied Its Sexual Violence Policy

After Jane filed her complaint, the Deputy Sexual Violence Investigative Officer ("investigator") was assigned to investigate it.[10] In his first notice to John, dated June 24, 2016, the investigator told John only that he had been accused of "violation of the University's Sexual Violence Policy." In the "Statement of Charge," dated July 8, 2016, he told John he had been accused of "sexual assault." The investigator did not tell John the specific facts alleged to have given rise to the charges.[11] He did, however, send John a copy of the University's Sexual Violence Policy, defining "sexual assault" as physical sexual contact involving "the use or threat of force or violence" or "with a person who is unable to consent due to incapacity or mental or physical impairment."[12]

---

[8] Disciplinary Procedures, II.D.

[9] *See, e.g.*, Ex. C, Code; University of Pennsylvania Nondiscrimination Statement (http://www.upenn.edu/almanac/volumes/v55/n18/aapolicy.html) (Ex. E) ("Nondiscrimination Statement").

[10] Verified Complaint, ¶ 11.

[11] Verified Complaint, ¶¶ 12, 15.

[12] Specifically, the copy of the policy sent to John (Ex. A to the Verified Complaint) provided:

Under the University's procedures, the respondent is not allowed to cross-examine his accuser or question witnesses – only the University investigator may do so. After interviewing the parties and two witnesses who had no direct knowledge of the parties' encounter, the original investigator and another administrator (the "investigative team") issued first a Draft Report and then a Final Report.[13] Though the "Statement of Charge" said Jane had complained of "sexual assault," the Reports did not include a finding of "sexual assault" and did not address the elements of sexual assault as set forth in the University's Sexual Violence Policy. Instead, in both Reports, the investigative team found, "by a preponderance of the evidence, that the Respondent violated the University's Sexual Violence policy by engaging in intercourse and other sexual acts with the Complainant without her consent." Draft Report, p.13; Final Report, p.13. Although the Sexual Violence Policy states that consent is "an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words *or actions*,"[14] the investigative team misinterpreted the Policy and concluded that Jane had not consented because she told them she "never said 'yes,' was never asked, and never initiated sexual contact." Final Report, p. 13. The investigative team also concluded, after considering "the facts of the case along with applicable University precedent" and "the Complainant's request that the Respondent

---

**Sexual assault** (including but not limited to rape) is defined as having committed any of the following acts:
• Any physical sexual contact that involves the use or threat of force or violence or any other form of coercion or intimidation;
• Any physical sexual contact with a person who is unable to consent due to incapacity or mental or physical impairment. "Incapacity" or "impairment" include but are not limited to being under the influence of alcohol or drugs or being too young to consent.

[13] Verified Complaint, ¶¶ 16-25.

[14] Ex. A, Sexual Violence Policy (emphasis added).

6

be held accountable for his actions," that John should be expelled and that "the violation of the University's sexual violence policy and sanction shall remain on [his] academic transcript permanently." Final Report, p. 18.[15]

### 2.   The Investigation Was Neither Thorough Nor Fair

After John read the investigative team's Draft Report, and, for the first time, learned Jane's version of events and the investigative team's interpretation and application of the Sexual Violence Policy, he asked for copies of the documents and statements the team had relied upon. The request was refused. He was allowed to *review* the materials, but the interview notes he was given consisted of incomplete and often inaccurate summaries and characterizations, with no clear record of the investigative team's questions, the parties' and witnesses' answers, or even how long the interviews were. What *was* apparent from both the Report and the documents was that, in reaching their conclusions and deciding whom to believe, the investigative team applied completely different standards to Jane and John. Again, the factual details are in the Verified Complaint, but John will summarize them briefly here.

With respect to Jane, the investigative team failed to address the contradiction between a report she had made to police and the story she told the investigator. Jane told the police that when she and John arrived at the intersection near his home, she told him that she "was tired and wanted to go to bed," and he then "grabbed me by my hair, arm, and neck at point [sic] while pulling me into the house." In contrast, according to the investigator's notes, Jane told the investigator John had "gently pulled her" toward the front door of his house and then "led" her up the stairs and to his bed. In their Reports, the investigative team did not even accurately

---

[15] Verified Complaint, ¶ 17.

7

recount the statement she made to them: instead, they said John "pulled" Jane toward the house (omitting Jane's word "gently") and "pulled" her into the bedroom and onto his bed.[16]

The team also disregarded Jane's motive to fabricate a story – she first made a claim of assault after she returned home the morning of June 8 and realized she had left her roommate waiting outside for hours in the middle of the night. Almost two hours later, Jane sent text messages to her roommate that should at least have led the team to ask questions about her state of mind, but the team did not record any questions about the texts and did not even mention the texts in the Reports. And the team shored up Jane's story with statements from two "witnesses" (the roommate and a friend who introduced Jane and John) who had no first-hand knowledge of the alleged encounter, while ignoring evidence that those witnesses were biased and unreliable.[17]

In stark contrast, the team labeled John dishonest and incredible based primarily on a minor discrepancy in the time the parties said Jane left his home, even though both John and Jane agreed she spent the night with him after their sexual encounter and did not leave until sometime in the morning. Based on that discrepancy and another the team simply invented, they felt free to disregard John's account that Jane expressed consent through enthusiastic participation in sexual conduct, and to accept Jane's account on every point on which the two differed.[18]

John pointed out these flaws to the investigative team, submitting a detailed response to the Draft Report, a Supplemental Statement of Facts, and photographs. In John's response, among other things, he asked the team to consider Jane's false statement to police and her lack of

---

[16] Verified Complaint, ¶¶ 104-107.

[17] Verified Complaint, ¶¶ 113-122.

[18] Verified Complaint, ¶¶ 109-111.

8

credibility, and the team's own failure to accurately report what she said. In his Supplemental Statement of Facts, he described the sequence of events and the facts that supported his belief that the sexual encounter was consensual. All of the information in his Statement would have been part of the Report had the investigative team given him fair notice of the allegations against him, fairly sought his account, and accurately summarized his interviews.[19]

The investigative team issued the Final Report less than 48 hours later, with no changes in their "findings" or sanctions. Instead of addressing John's concerns, the investigative team changed the "facts" by stating that the investigator *had* asked Jane about her contradictory statement to the police and that she told the investigator John had pulled her into the house while holding her hand and using his other arm to hold her "around her neck, head, and hair." This new information appeared *nowhere* in the investigator's interview summary (or anywhere else in the record), and is flatly inconsistent with what the interview summary did say: John "gently pulled her toward the front door." *Compare* Draft Report, p.9 *with* Final Report, p. 9. The team also failed to address John's photographs or his Supplemental Statement.[20]

In theory, the disciplinary process is not concluded. The next step is for the investigative team to present the Final Report to a Hearing Panel (Disciplinary Procedures, II.G), and a hearing has been scheduled for September 29, 2016. In reality, however, John cannot get the fair hearing to which he is entitled. Under the Disciplinary Procedures, the Final Report will form the foundation for any further proceedings. Nothing in the Disciplinary Procedures will give John the safeguards he needs to overcome the violations that have already occurred. John still will not

---

[19] Verified Complaint, ¶¶ 22-24.

[20] Verified Complaint, ¶¶ 25-26.

9

have the right to cross-examine witnesses. The record of the investigation will still be biased and incomplete: the investigative team's addition to the Final Report of new "facts" not included in its own interview summaries confirms that either the team did not keep complete, accurate records or it fabricated details to support its conclusions - or both. The Disciplinary Hearing Officer (DHO) has refused to admit evidence that John passed a polygraph examination, even though the polygraph results are part of John's objections to the Final Report and the DHO does not have discretion to exclude them.[21] The Hearing Panel is made up of three University faculty members and a non-voting administrator, not objective judicial officers. The Hearing Panel may hold John responsible not only by a mere preponderance of the evidence, but by a 2-1 vote. And under the Disciplinary Procedures, if the Hearing Panel finds him responsible, it must determine the appropriate sanction "*with a presumption in favor of the sanction recommended by the [investigative officer]*." Disciplinary Procedures, II.G.3.i (Ex. B) (emphasis added).

In the words of a federal court that recently denied a university's motion to dismiss certain claims filed by a student (a different John Doe) who was branded a sexual predator:

> Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. *If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.*

*Doe v. Brandeis Univ.,* No. 15-cv-11557, 2016 U.S. Dist. LEXIS 43499, *15 (D. Mass. Mar. 31, 2016) (emphasis added). Here, that fairness is not just "reasonable" – it is contractually required.

---

[21] Verified Complaint, ¶ 130.

The stakes here are high and the damage irreparable. John has been threatened with expulsion and labeled a sexually violent offender. This will permanently scar his life, his educational opportunities, and his career. This Court should grant John the relief he seeks.

## II.   ARGUMENT

Under Rule 65, the standards for granting a temporary restraining order (TRO) are the same as those for a preliminary injunction. A TRO can be granted "where the movant has made reasonable efforts to provide notice and demonstrated the following four elements: (1) a likelihood of success on the merits; (2) the probability of irreparable harm if the relief is not granted; (3) that granting injunctive relief will not result in even greater harm to the other party; and (4) that granting relief will be in the public interest." *Citibank N.A. v. Kyle*, No. 15-cv-3298, 2015 U.S. Dist. LEXIS 77504, at *6-7 (E.D. Pa. June 16, 2015) (Kelly, J.) (granting TRO).[22]

The Court should grant John's Motion, issue a temporary restraining order, and set a hearing to consider granting preliminary injunctive relief. As set forth in more detail below, John will likely succeed on his breach of contract and Title IX claims. John has suffered, and will continue to suffer, irreparable harm, including the threatened expulsion, inability to earn a college degree, denied or impaired career and graduate school opportunities, and the lifelong stigma of being labeled a sexually violent offender. The harm to John is far greater than any harm to the University that could result from granting the requested relief. The public has an undeniable interest in ensuring the University's wrongful, unfair, and discriminatory conduct is enjoined. As other courts have recognized in cases involving issues similar to those here, this

---

[22] Plaintiff's counsel provided notice by emailing the Verified Complaint and his Motion for Temporary Restraining Order and supporting Memorandum to the University's general counsel on September **, 2016.

case cries out for immediate injunctive relief. *See, e.g.*, *Ritter v. Oklahoma*, 2016 U.S. Dist.

LEXIS 60193, at *6-7 (W.D. Okla. May 6, 2016) (granting TRO to student expelled due to

alleged violation of university's sexual misconduct policy; "[w]hen the penalty is as severe as

that imposed in this case, with its potentially devastating consequences, the accused is entitled to

more process than plaintiff was afforded"); *Doe v. Middlebury Coll.*, No. 1:15-cv-192 (D. Vt.

Sept. 16, 2015) (granting preliminary injunction to student expelled for purported sexual

misconduct) (copy attached as Ex. 1); *King v. DePauw Univ.*, 2014 U.S. Dist. LEXIS 117075

(S.D. Ind. Aug. 22, 2014) (granting preliminary injunction to student suspended for purported

sexual misconduct).

While, as noted above, the University's disciplinary process is in theory not complete, it

has been irreparably tainted by the flaws and blatant bias in the investigation and the Reports.

Because exhaustion of internal remedies would be futile and would only exacerbate the harm to

John, this Court should grant relief now.[23]

### A.     John Is Likely to Succeed on His Breach of Contract and Title IX Claims[24]

#### 1.     John Is Likely to Succeed on His Breach of Contract Claim

"[T]he relationship between a private educational institution and an enrolled student is

contractual in nature; therefore, a student can bring a cause of action against said institution for

breach of contract where the institution ignores or violates portions of the written contract."

[23] Exhaustion of university grievance procedures should not be required when the process would
be a sham or futile. *See Alvin v. Suzuki*, 227 F.3d 107, 118-19 (3d Cir. 2000) (noting professor
need not utilize university grievance process if it is a sham or efforts would be futile, though
court rejected futility claim based on very different facts).

[24] Plaintiff satisfies this element if he shows a likelihood of success on even one of his claims.
*See Miller v. Mitchell*, 598 F.3d 139, 148 (3d Cir. 2010) (upholding a preliminary injunction
based on a finding of likelihood of success on the merits on two of three claims).

*Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999).  Pennsylvania courts "review the agreement between the parties concerning disciplinary procedures[] contained within a portion of the student handbook . . . as we would any other agreement between two private parties." *Reardon v. Allegheny College*, 926 A.2d 477, 480 (Pa. Super. 2007).  "The general rule . . . has been that where a private university or college establishes procedures for the suspension or expulsion of its students, substantial compliance with those established procedures must be had before a student can be suspended or expelled."  *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 392 Pa. Super. 502, 510, 573 A.2d 575, 579 (1990).[25]

For a breach of contract claim, a plaintiff must allege (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  *Davis v. Wells Fargo*, 824 F.3d 333, 351 (3d Cir. 2016); *McShea v. City of Phila.*, 606 Pa. 88, 995 A.2d 334, 340 (2010).

With respect to the first element, the University's Disciplinary Procedures, Sexual Violence Policy, Student Code of Conduct, Charter, and other policy and procedure documents are binding, enforceable contracts. As set forth above, the University makes a number of express contractual commitments to students involved in a disciplinary process. It promises them "a

---

[25] In the cases cited in text, plaintiffs did not prevail because they did not point to specific contract provisions defendants had violated. In contrast, John has pointed to specific contract provisions and shown that at each step of the disciplinary process, the University did not comply with those provisions. Under the basic principles set forth by the Pennsylvania cases and on facts similar to those in this case, courts in other jurisdictions have not hesitated to grant injunctive relief. *See* cases cited at page 12; *see also Gjeka v. Del. County Cmty. College*, 2013 U.S. Dist. LEXIS 73054, *40 (E.D. Pa. May 23, 2013) (denying motion to dismiss claim based on allegation that college breached contractual provisions in its Harassment Policy "by not providing a learning environment free from discrimination and not encouraging faculty or students to 'bring questions about sexual harassment or discrimination to the attention of [defendant].").

process that is fundamentally fair, and free of bias or prejudice." Disciplinary Procedures, II.B.1 (Ex. B); see also Code of Conduct (Ex. C); Charter, § I.A (Ex. D). It promises to treat them "with respect, dignity, sensitivity, and fairness throughout the entire process." Disciplinary Procedures, II.B.2. It promises students will be "informed about the process both before the process is initiated and throughout the process as it unfolds." *Id.* It promises "a thorough and fair investigation," which must include "interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence." *Id.*, II.D. And it promises students will not be discriminated against based on race, color or sex. *See, e.g.*, Code (Ex. C); Nondiscrimination Statement (Ex. E).

With respect to the second element, the University breached its contractual obligations. The University breached the obligation to keep John informed: the investigative team did not adequately notify John of the allegations against him, did not let him know they were shifting their focus from "sexual assault" to affirmative consent, and did not let him know how they were interpreting the University's definition of "consent." While John knew he had been accused of "violation of the University's Sexual Violence Policy" and "sexual assault," "[t]here is little practical difference between a school failing to inform the accused of the charge against him or, as here, having informed him of the formal charge, refusing to provide him with the specific factual conduct alleged to have given rise to the charge. At a minimum, the failure to provide John with notice of the specific charges against him may have substantially impaired the fairness of the proceeding." *Brandeis*, 2016 U.S. Dist. LEXIS 43499, *99.

The University also breached its obligation to provide "a process that is fundamentally fair, and free of bias or prejudice," treat John "with respect, dignity, sensitivity, and fairness

14

throughout the entire process," and conduct "a thorough and fair investigation." *See* Disciplinary

Procedures, II.B, II.D. The investigative team did not thoroughly interview John or conduct a fair

interview; incorrectly interpreted and applied the University's definition of "consent;" repeatedly

altered Complainant's accounts and failed to discredit her as a result of her false statement to

police; applied drastically different standards to John and Jane and made unfounded conclusions

that John was not credible as to "material matters" that were not material at all; disregarded other

relevant evidence; failed to adequately interview witnesses and acknowledge their biases; failed

to acknowledge the Complainant's motive to fabricate a story; and placed unfair limitations on

his ability to access and evaluate information. *See* cases cited at p.12, granting injunctive relief

on similar facts. *See also* Declaration of Brett A. Sokolow, an expert on the standard of care

required of Title IX funding recipients in the context of campus disciplinary procedures in sexual

assault cases, explaining how the University failed to comply with Title IX and the University's

own policies in the administration of this investigation (Sept. 21, 2016) (Ex. 2).

  With respect to the third element, the University's breach has caused and will continue to

cause damages to John, as set forth in detail in Section II(C) below. This Court has the authority

to grant equitable relief as well as damages for the University's breach of contract. *See Strank v.

Mercy Hospital of Johnstown*, 383 Pa. 54, 57 (1955) (court has jurisdiction "for the enforcement

of obligations whether arising under express contracts, written or oral, or implied contracts,

including those . . . between an educational institution and its students).

  On facts similar to those here, courts have readily found a likelihood of success on breach

of contract claims and have granted injunctive relief. *See, e.g.*, *Ritter*, 2016 U.S. Dist. LEXIS

60193, at *7-8 (finding likely success on the merits of breach of contract claim where college

15

promised "an equitable resolution" and did not provide it; process in which accused did not have "a reasonable opportunity to present his version of the events" was unfair, particularly in light of severe penalty of expulsion); *Middlebury Coll.*, slip op. at 7 (finding likely success on merits because college instituted and prosecuted investigation and adjudication in violation of its policies and procedures; granting injunction); *Doe v. Brown Univ.*, No. 2016-cv-17-S (D.R.I. Apr. 25, 2016) (finding likely success on claim that University breached contract with student by applying definition of consent from policy that was not in effect at the time of the conduct at issue; granting TRO) (Ex. 3); *King*, 2014 U.S. Dist. LEXIS 117075, at *37-38  (finding likely success on implied contract claims where, among other things, it was not clear complainant was "incapacitated" under university's definition or that respondent knew or should have known she was incapacitated; evidence of incapacitation was based on testimony of witnesses who had seen her earlier in the evening and not at the time of the alleged encounter, and witnesses were not asked how they defined incapacitated); *see also Brandeis*, 2016 U.S. Dist. LEXIS 43499, *99 (in case involving student disciplined for alleged sexual misconduct, court denied university's motion to dismiss certain breach of contract claims and held plaintiff plausibly alleged university failed to provide basic fairness by failing to give him adequate notice, denying him the right to confront his accuser or cross-examine witnesses, denying him copies of documents, giving a single individual the power to investigate, prosecute, and convict without effective review by a neutral party, and applying preponderance of evidence standard).

For the reasons cited in the cases above, John is likely to succeed on his breach of contract claim. In the words of the *Brandeis* court (which, as noted above, involved a different John Doe): "[T]his was not a criminal proceeding, and [the University] is not a governmental

16

entity. Nonetheless, the stakes were very high. John was charged with serious offenses that carry the potential for substantial public condemnation and disgrace. He was required to defend himself in what was essentially an inquisitorial proceeding that plausibly failed to provide him with a fair and reasonable opportunity to be informed of the charges and to present an adequate defense. He was ultimately found 'responsible,' and received a penalty that may permanently scar his life and career. Under the circumstances, the complaint plausibly alleges that the procedures employed by [the University] did not provide him with the 'basic fairness' to which he was entitled." *Id.* at *109. The court's observations and conclusions apply equally here.

### 2.    John Is Likely to Succeed on His Title IX Claim

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX "'bar[s] the imposition of university discipline where gender is a motivating factor,'" and is enforceable through a private right of action for damages as well as for injunctive relief. *Doe v. Columbia Univ.*, 2016 U.S. App. LEXIS 13773 (2d Cir. 2016) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994)). The University receives federal funds, and so may be held liable under Title IX. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

On the facts as alleged in the Verified Complaint, John will likely succeed on his Title IX claims. Gender discrimination, and gender (and racial) stereotypes, permeated the investigation and the outcome. The investigative team acted as Jane's advocate rather than as an objective factfinder. It failed to give John adequate notice, misapplied the definition of "consent" to favor Jane's account and undermine John's, applied drastically different standards to him and to Jane, manipulated the "facts" to bolster Jane's claims and support a decision to accept her word over

17

his, ignored evidence that favored John, and reached conclusions not warranted by the facts. The harsh punishment the investigative team chose is also unwarranted and out of proportion to the alleged offense. The University failed to provide a fair and equitable process for both the complainant and the accused, and failed to "accord[] due process to both parties involved."[26] *See* Sokolow Declaration (Ex. 2).

Other facts cited in the Verified Complaint further demonstrate that the bias against John was gender-based. The great majority of sexual assault complaints are brought by female students against male. The University has been criticized for not taking seriously female students' complaints of assault by male students. It has taken actions to refute those criticisms, has used blatantly pro-female, anti-male materials for training purposes, and has never disavowed those materials.[27] To cite just one example, on June 29, 2016, after Jane's complaint but before the investigator decided to pursue charges, the Penn campus newspaper published an article titled "Advocacy Groups Worry About a Penn Brock Turner," referring to the notorious case of a student sentenced to six months in jail after being found guilty of sexually assaulting an unconscious woman. "Campus leaders" quoted in the article said the same thing could happen at Penn: "'It's a good thing that people are standing up and getting angry and realizing that there needs to be a shift in rape culture, especially towards those who were more lenient and supportive of Brock.'"[28]

---

[26] U.S. Dep't of Educ., Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties,*" at 22 (Jan. 2001), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[27] Verified Complaint, ¶¶ 156-161.

[28] Verified Complaint, ¶ 162.

In *Doe v. Columbia*, the Second Circuit held that a university student investigated and suspended for an alleged sexual assault had stated a claim under Title IX. In support of its ruling, the Court cited factual allegations that the University had failed to seek out witnesses and information favorable to the respondent; failed to "act in accordance with University procedures designed to protect accused students"; and "reached conclusions that were incorrect and contrary to the weight of the evidence." 2016 U.S. App. LEXIS 13773, *25-26. In the *Columbia* court's words, "[t]he alleged fact that [the University's agents] . . . chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute." *Id.* at *27. Public criticism of Columbia's handling of sexual assault claims, and Columbia's response to those accusations, makes it "entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." *Id.* at *27-28. Plaintiff's claims were further supported by allegations showing the bias of Columbia's investigator: although the investigator "was not the decision-maker, she allegedly had significant influence, perhaps even determinative influence, over the University's decision. . . . The Complaint plausibly alleges that her report advocating discipline influenced the University's decision to sanction [Plaintiff]." *Id.* at *31-32; *see also Yusuf*, 35 F.3d at 715-16 (finding actionable Title IX claim based on allegations that plaintiff "was innocent and wrongly found to have committed an offense"; also recognizing that Title IX can be violated by "selective enforcement," if "decision to initiate the proceeding" and "severity of the

19

penalty" "was affected by the student's gender" without regard to guilt); *Doe v. Brown*, 2016

U.S. Dist. LEXIS 21027, at *15; *Williams v. Franklin & Marshall College*, 2000 U.S. Dist.

LEXIS 691, *4 (E.D. Pa. Jan. 13, 2000) ("Unquestionably, plaintiff has alleged gender

discrimination adequately. He charges the institution with fomenting a witch-hunt against male

students on a totally unfounded belief that date-rape activities were rampant on campus, and that

this crusade culminated in utterly false allegations of misconduct against plaintiff. He also

charges that males were treated differently from females in disciplinary matters, that the college

violated its own regulations, etc., etc.").

Although the cases above were decided on motions to dismiss, the courts' conclusions

nonetheless support John's position here: he has alleged similar facts, and his factual allegations

demonstrate that he is likely to prevail on the merits of his Title IX claim. The facts also show

gender bias, as noted above. At this stage of the proceedings, John is not able to offer specific

case examples or statistics to support his allegation that the University deliberately favors

women over men. The investigative team stated that its sanction decision was based on

"applicable University precedent" (see Final Report, p.18), but when John asked for data

regarding "University precedent," the team refused to provide it.[29] As a district court recently

stated: "One particular challenge in these types of cases is that the best information for

discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his

status as an accused student is generally in the possession of the defendant: namely, what are the

overall outcomes of such cases and, more specifically, how have cases been handled in which the

accused student is female and/or the alleged victim is male? . . . . Requiring that a male student

---

[29] Verified Complaint, ¶ 166.

conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts." *Doe v. Brown*, 2016 U.S. Dist. LEXIS 21027, *22-23, 25-26.

While again the procedural context is different, the *Brown* court's observations apply equally here. The University has control over the data relevant to gender bias, and the facts John has alleged show a likelihood of success on the merits of his Title IX claim. Indeed, the University's refusal to provide information the investigative team cited to support the chosen sanctions is in itself evidence of bias.

### B.     Without Judicial Intervention, John Will Suffer Irreparable Harm

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). That element is easily satisfied here.

First, the expulsion of John from the University for alleged sexual violence, during his senior year and after he has invested hundreds of thousands of dollars in his education, constitutes irreparable harm. He will not receive a University of Pennsylvania degree. He likely will be precluded from getting his degree at any other college of comparable prestige, due to the University's recommendation that his expulsion and the alleged sexual violence offense be permanently noted on his transcript. It is difficult to imagine another college wanting to admit a "sexually violent" student who has already been expelled. In the context of a college disciplinary matter and resulting sanctions, a plaintiff's inability to continue or complete his education is irreparable injury. *See, e.g.*, *Gati v. Univ. of Pittsburgh*, 91 A.3d 723, 729 n.10 (Pa. Super. 2014)

(court "would have no trouble" finding irreparable harm when university dismissed student for dishonesty shortly before his graduation and defendant's "argument to the contrary is entirely unpersuasive")[30]; *see also Jones v. Board of Governors of the University of North Carolina*, 557 F. Supp. 263, 266 (W.D.N.C. 1983), *aff'd* 704 F.2d 713 (4th Cir. 1983) (finding irreparable harm because student could not be adequately compensated for delay in obtaining a degree caused by suspension and granting injunction); *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8 ("loss of educational and career opportunities" is irreparable harm which "is not readily compensable in money damages"); *Tully v. Orr*, 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985) (finding irreparable harm from expulsion for cheating and plagiarism, noting "indelible stigma of having once been disenrolled," and granting injunction).

Second, being labeled a sexually violent offender irreparably harms John, his reputation, and his future educational, professional, and social prospects. He will have to disclose it whenever he is asked if he has been the subject of a disciplinary proceeding or been found responsible for a violation, a common question in applications for graduate or professional school, professional licensure, and in employment.[31] The term "sexual violence" is particularly

---

[30] In *Gati*, though the Superior Court found clear irreparable harm, it reversed the trial court's order enjoining the university from dismissing the plaintiff and requiring it to issue him a diploma. This was in part because the Superior Court held the plaintiff was not likely to succeed on his breach of contract claim, but the facts were very different from those here: the university dismissed a student for his admitted dishonesty, following a "host of other violations"; the basis for dismissal was specified in the student handbook; the university "followed its written procedure in arriving at its dismissal decision," and the university gave plaintiff appropriate notice and an opportunity to be heard. 91 A.3d at 734-35.

[31] In fact, some states, such as New York and Virginia, are enacting legislation to require colleges to include a notation on a student's transcript if he has been found responsible for sexual misconduct. *See* Tovia Smith, "Push Grows for a 'Scarlet Letter' on Transcripts of Campus Sexual Offenders," NPR (May 11, 2016), *available at*

inflammatory. The inescapable connotation is that John engaged in violent conduct rather than what actually happened: he participated in a sexual encounter that the University investigative team concluded did not meet its definition of affirmative consent.

"Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (reversing district court order and directing court to issue an injunction). Although that case was decided in a commercial context, the basis for the finding of irreparable harm – loss of reputation and loss of opportunities – easily translates to the harm to John here. As the district court noted in *Doe v. Brandeis*:

> A finding of responsibility for sexual misconduct can also have significant consequences off-campus. Post-graduate educational and employment opportunities may require disclosure of disciplinary actions taken by a student's former educational institution . . . . [A] student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions. It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction. Nevertheless, they bear some similarities, particularly in terms of reputational injury. Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.

2016 U.S. LEXIS 43499, at *92. Other courts have also emphasized the stigma of a sexual misconduct finding on post-collegiate life. *See, e.g.*, *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8 (noting loss of educational and career opportunities); *King,* 2014 U.S. Dist. LEXIS 117075, at *39-40 (noting impact on future employers and graduate school admissions committees). That stigma remains even if John were eventually reinstated, which is why this sort of harm is irreparable. *See Tully*, 608 F. Supp. at 1225.

---

http://www.npr.org/2016/05/11/477656378/push-grows-for-a-scarlet-letter-on-transcripts-of-campus-sexual-offenders?utm_medium=RSS&utm_campaign=news.

Third, John will be irreparably harmed because the threatened expulsion denies him the intangible benefits of his bargain with the University: full participation in the college experience, not just academics, but also other aspects such as athletics and social relationships. Depriving a student of these benefits is irreparable harm that cannot be compensated with money damages. Courts, including the Supreme Court of the United States, have recognized this kind of harm as a reason to grant injunctive relief. *See Reynolds v. Int'l Amateur Athletic Fed'n*, 112 S. Ct. 2512, 2513 (1992) (entering an injunction to allow an Olympic hopeful to participate in U.S. Olympic trials over objection of defendants, who alleged athlete should not be eligible to compete; finding irreparable harm based on loss of intangible benefits); *Palo v. Iowa Board of Regents*, No. CVCV08520 (Iowa D.C. Story Cty. Jan. 16, 2014) (sanction that prevented college student from playing on college's basketball team caused irreparable harm; even if student prevailed on merits, he would never get back the opportunity to play basketball as a senior) (Ex. 4).

Fourth, John will be irreparably harmed by the gap in his education that will result if the University expels him. Even if justice prevails and John is reinstated, or even if he could continue at another college in the future, courts have frequently held that *any* gap in a college education constitutes irreparable harm. As the court explained in *King v. DePauw University*:

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw—
> even if, as DePauw asserts, he could choose to attend another university and
> ultimately graduate on time—he will forever have a gap or a senior-year transfer
> on his record. The Court finds it inevitable that he would be asked to explain
> another situation by future employers or graduate school admissions committees,
> which would require him to reveal that he was found guilty of sexual misconduct
> at DePauw. ***Successfully seeing this lawsuit to its conclusion could not erase
> the gap or the transfer; the question will still be raised, and any explanation is
> unlikely to fully erase the stigma associated with such a finding.***

2014 U.S. Dist. LEXIS 117075, at *39-40 (emphasis added); see also *Middlebury*, No. 1:15-cv-192, slip op. at 7 (finding irreparable harm that cannot be compensated with money because

24

"Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.").

### C. The Harm to John Outweighs Any Potential Harm to the University

John also satisfies the third element, which requires the Court to balance the relative harm to the parties: the potential harm to John if an injunction is not issued versus the potential harm to the University if it is. *See, e.g.*, *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010). The harm John will suffer if the tainted process is not stopped is greater than any potential harm to the University. If the University loses on the merits, it will have avoided an unnecessary hearing, and the interruption in the process might even mitigate its damages. If the University wins, the only harm to it would be the delay in completing the internal disciplinary process. The balance of harms firmly favors John. *See, e.g., Ritter*, 2016 U.S. Dist. LEXIS 60193, at *5 (noting balance favors granting injunction because any harm to college is "inconsiderable" compared to harm to student if he was wrongfully expelled); *Middlebury*, No. 1:15-cv-192, slip op. at 7–8 (finding balance weighs in favor of student); *King*, 2014 U.S. Dist. LEXIS 117075, at *40–42 (finding balance of equities "firmly" in student's favor: "the real, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university); *see also MarbleLife, Inc*, 759 F. Supp. 2d at 563 (granting preliminary injunction in trademark infringement case and finding that any harm to defendant was at least partly self-inflicted due to its failure to abide by its contractual obligations).

### D. The Public Has an Interest in the Enforcement of Contracts and the Fair and Non-Discriminatory Treatment of College Students

25

The public interest element also weighs in favor of granting the restraint and injunction. As the Third Circuit has stated, where, as here, a plaintiff has already demonstrated likely success on the merits and irreparable harm, "it almost always will be the case that the public interest will favor the plaintiff." *AT&T Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). In addition:

- The Verified Complaint alleges fundamental breaches of contract, and "the public interest favors enforcing valid contracts and making parties live up to their agreements." *MarbleLife*, 759 F. Supp. 2d at 563 (granting injunction).

- John has been treated unfairly by the University, and "it is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at \*8; *see also King*, 2014 U.S. Dist. LEXIS 117075, at \*42-43 (public interest in applying policies fairly in disciplinary matters).

- It is similarly in the public interest to remedy and eradicate discrimination. *See, e.g.*, *Dole v. Local 427*, 894 F.2d 607, 616 (3d Cir. 1990) (noting that anti-discrimination statutes serve the public interest in curtailing discrimination).

In addition to the general public interest, the University of Pennsylvania community has a specific interest in seeing that the University's Disciplinary Procedures for "sexual violence" complaints are applied fairly and without discrimination. In the words of Penn law professors who have criticized the Disciplinary Procedures: "We can and should provide protection and support for those who are subject to sexual abuse, and at the same time provide a fair process that is calculated to yield a reliable factual determination. Ultimately, there is nothing inconsistent with a policy that both strongly condemns and punishes sexual misconduct and

26

ensures a fair adjudicatory process." Open Letter, p. 5-6

(http://media.philly.com/documents/OpenLetter.pdf) (last viewed September 18, 2016).[32]

## III. CONCLUSION

John respectfully submits that the Court should enter a temporary restraining order and order the University to show cause why a preliminary injunction should not issue. Specifically, John asks this Court to order the University to halt the disciplinary process and set aside both the finding that John violated the University's Sexual Violence Policy and the threatened sanctions. If the University wishes to proceed with a disciplinary process, it should not be allowed to do so unless it appoints a new, independent investigator from outside the University to determine whether there is sufficient basis to conduct a full investigation and, if so, to conduct a fair and complete investigation, including addressing the issues John raised in his Verified Complaint. The University should not be allowed to use any information or materials generated during the sham investigation, including the Reports and the interview summaries and notes, and should destroy those materials.

Dated: September 23, 2016

Respectfully submitted,

Patricia M. Hamill (Pa. Id. No. 48416)
CONRAD O'BRIEN PC
1500 Market Street
Centre Square – West Tower, 39th Fl
Philadelphia, PA 19102-1921
(t) (215) 864-9600
(f) (215) 864-9620
(e) phamill@conradobrien.com

*Counsel for Plaintiff John Doe*

---

[32] Verified Complaint, ¶¶ 40-43, 159.

27

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the University of

Pennsylvania through its attorney James A. Keller on September 22, 2016.