## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE TRUSTEES OF THE UNIVERSITY | : | |
| OF PENNSYLVANIA | : | NO. 16-5088 |

## MEMORANDUM

**Padova, J.**                                                          **September 13, 2017**

Plaintiff John Doe, a student at the University of Pennsylvania, commenced this action against Defendant The Trustees of the University of Pennsylvania to challenge disciplinary proceedings that resulted in a finding that Plaintiff had violated the University's Sexual Violence Policy in connection with a sexual encounter he had with another student, identified as Jane Roe. Defendant has filed a Motion to Dismiss Plaintiff's Verified Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, we grant the Motion in part and deny it in part.

## I.     BACKGROUND

The Complaint alleges that, on the night of June 7, 2016, Plaintiff and Jane Roe, both rising seniors at Penn, were introduced to one another by a mutual friend at a local bar. (Compl. ¶¶ 1, 4, 56.) At 1:45 a.m. on June 8, the three went to a nearby members-only bar, where Jane, who did not appear drunk, flirted with John. (Id. ¶¶ 56-57.) When Jane was ready to leave, Plaintiff offered to walk her home and she agreed. (Id. ¶ 58.) Plaintiff and Jane held hands during the five or six block walk, and kissed along the way. (Id. ¶ 59.) When they arrived at an intersection near Plaintiff's house, Plaintiff invited Jane in for "some fun." (Id. ¶ 61.) She said that she was tired, but Plaintiff suggested that she join him for just a few minutes and she agreed. (Id.) They

both walked upstairs to Plaintiff's bedroom on the second floor and had a sexual encounter, which included intercourse. (Id. ¶¶ 1, 4, 62, 66.) Afterwards, Jane stayed and cuddled with Plaintiff, asked that he set an alarm so that she could get to work in the morning, and went to sleep in his bed. (Id. ¶ 69.)

Plaintiff later learned that when Jane returned home during the morning of June 8, she found her roommate sitting on the front step, having returned from study abroad in the middle of the night. (Id. ¶ 73.) The roommate had not been able to get into the house because Jane was not home. (Id.) When the roommate asked where Jane had been, Jane responded that she had been at "some asshole's place." (Id. ¶ 74.) Jane then went inside to charge her phone and saw that her roommate had sent her a text message in the middle of the night, saying "I'm going to kill you," because Jane had promised to be home when her roommate arrived. (Id. ¶¶ 73, 75.) The roommate reported that she later found Jane crying and asked if she'd been raped, and Jane said yes. (Id. ¶ 76.) That same day, Jane went to Penn Women's Center, then to the Special Services Department in the Division of Public Safety and, finally, to the Philadelphia Police Department's Special Victims Unit. (Id. ¶ 78.)

Jane filed an official complaint with the University's Office of the Sexual Violence Investigative Officer on June 20, 2016, and an officer was assigned to review the matter. (Id. ¶¶ 79-80.) On June 24, the investigator sent Plaintiff an email, stating that he was investigating an allegation that Plaintiff had violated the University's Sexual Violence Policy, but did not provide any additional details. (Id. ¶ 128.) The investigator interviewed Plaintiff on July 6, 2016. (Id. ¶ 130.) Plaintiff admitted that he and Jane had a sexual encounter and answered all of the questions he was asked. (Id.) Two days later, on July 8, the investigator emailed Plaintiff a letter labeled "Statement of the Charge," which advised John that he was being charged with "sexual assault," but contained no details other than that Jane had accused him of sexually assaulting her

on June 8.  (Id. ¶ 131.)   The University's Sexual Violence Policy defines "sexual assault" as follows:

> **Sexual assault** (including but not limited to rape) is defined as having committed any of the following acts:
>
> - Any physical sexual contact that involves the use or threat of force or violence or any other form of coercion or intimidation;
>
> - Any physical sexual contact with a person who is unable to consent due to incapacity or impairment, mental or physical.   "Incapacity" or "impairment" includes but is not limited to being under the influence of alcohol or drugs or being too young to consent.

(Compl. Ex. A at 1.)

On August 22, 2016, after conducting an investigation, the "investigative team" issued a Draft Report, which reported the investigator's findings, by a preponderance of the evidence, that Plaintiff had violated the Sexual Violence Policy by engaging in intercourse and other sexual acts without Jane's consent.  (Id. ¶ 133.)   The University's policy defines consent as "'an affirmative decision to engage in mutually agreed upon sexual activity and is given by clear words **or actions**.'"  (Id. (quoting Compl. Ex. A. at 1.).)   The Draft Report includes the team's conclusion that Jane had not consented because she "never said 'yes,'" was never asked for consent, and never initiated sexual conduct.   (Id.)   The Report did not address the elements of sexual assault that are set forth in the University's Sexual Violence Policy.   (Id.; see also Compl. Ex. A at 1.)   The Draft Report included the investigator's conclusion that Plaintiff should be expelled and that his violation of the University's Sexual Violence Policy should be permanently placed on Plaintiff's academic transcript.   (Compl. ¶ 134.)

Plaintiff learned of Jane's version of events through the Draft Report, and it shocked him. (Id. ¶ 135.)   The Report focused on the absence of a specific conversation about intercourse and completely discounted, *inter alia*, Plaintiff's stated belief that Jane was "definitely into it" and

Jane's own statement that she "cooperated." (Id.) The parties were given seven days to review and comment on the Draft Report, which included the opportunity to review the underlying evidence and statements, but they were not given permission to make copies. (Id. ¶ 136.) In reviewing the report, Plaintiff learned for the first time that Jane had "given completely different stories to the police and to the investigator" concerning what happened when they stopped outside Plaintiff's house on June 8, telling the police that Plaintiff "grabbed [her] by [her] hair, arm and neck, . . . while pulling [her] into [his] house" and telling the investigator, as documented in the investigator's notes, that Plaintiff had "gently pulled her toward [his] front door" and "led her upstairs." (Id. ¶ 140.) The Draft Report purported to reconcile these two accounts by concluding that Plaintiff "pulled" Jane toward the house (omitting the qualifier "gently") and "pulled" her into the bedroom and onto the bed. (Id. ¶ 141.)

In early September, Plaintiff submitted his response to the Draft Report, which pointed out "fundamental flaws" in the investigation and the report, including the investigative team's application of different credibility standards to Plaintiff and Jane. (Id. ¶ 142.) Among the other problems Plaintiff raised were: the investigative team's failure to acknowledge (1) inconsistencies between Jane's account to police and her account to the investigator, (2) Jane's motive for fabricating a story, and (3) text messages that Jane sent to her roommate later in the morning of June 8, which, according to the Complaint, undermined Jane's account; the investigator's reliance on two witnesses (the roommate and the student who introduced Jane and Plaintiff to one another), neither of whom had first-hand knowledge of the sexual encounter and both of whom were biased and unreliable; the investigator's determination that Plaintiff was incredible based in part on his mis-reporting of when Jane left Plaintiff's house;[1] and the

---

[1] John stated to investigators that Jane left at 8 a.m., believing she had left that that time because she set an alarm for 8:00, but Jane actually left before the alarm at 6:30 a.m. (Compl. ¶

investigator's drawing of unsupported and unwarranted conclusions from the fact that Plaintiff turned off Jane's cell phone and then told her that he had not.   (Id. ¶¶ 142, 146, 159, 161, 164, 166, 168.)   Plaintiff also submitted a supplemental statement of facts giving greater details, including details supporting his position that Jane affirmatively consented, all of which he would have provided earlier had he been given more specific detailed notice of the allegations against him during the initial interview.   (Id. ¶ 143.)

Two days after receiving Plaintiff's objections, the investigative team issued a Final Report, which included the same conclusions as the Draft Report and omitted any discussion of the majority of John's concerns and his supplemental factual statement.   (Id. ¶ 145.)   The investigator addressed the inconsistencies in Jane's statements in the Final Report by adding new information concerning his interview with Jane that he had not included in his initial report summary.   (Id. ¶¶ 146-47.)   Crucially, the investigator reported that, when he questioned Jane about her inconsistent statement to the police, she told him that Plaintiff had "pulled her into the house while holding her hand and using his other arm to hold her around her neck, head, and hair." (Id. ¶ 146.)

Following the issuance of the Final Report, the case proceeded to a hearing before a Hearing Panel.   (Id. ¶¶ 21, 178.)   The Panel was comprised of three University faculty members, all of whom were among the small subset of professors professionally affiliated with the University's Gender, Sexuality and Women's Studies Program and all of whom had a relationship with Jane's advisor.   (Id. ¶¶ 21, 213-14.)   Moreover, the Panel had been trained with materials that predispose panel members to believe the female accuser and had not been trained to decide each case on its own merits.   (Id. ¶¶ 218-19.)

---

159.)   According to the Complaint, this discrepancy was inconsequential as both agreed that Jane stayed until the morning.   (See id.)

Plaintiff submitted several pages of proposed cross-examination questions for the Panel to ask the Investigator at the hearing, but the Panel asked almost no questions at all and asked only one of Plaintiff's proposed questions.  (Id. ¶¶ 180, 202 n.8.)  At the conclusion of the hearing, the Hearing Panel agreed with the Investigator that Plaintiff had violated the University's Sexual Violence Policy and, by a 2-1 majority, it adopted the investigator's recommended sanction of expulsion and a permanent notation on Plaintiff's transcript.  (Id. ¶¶ 25, 27.)

The Panel's written decision stated that Jane alleged in her complaint that Plaintiff "raped her by penetrating her without her consent," even though Plaintiff had not previously been told that Jane had made this accusation.  (Id. ¶ 184.)  Moreover, while the investigator had concluded that Plaintiff had engaged in intercourse and other sexual acts without Jane's consent and Plaintiff had not been charged with rape, the Hearing Panel concluded that he had raped her.  (Id. ¶¶ 133, 185.) Specifically, the Panel found that Jane had "felt intimidated" and, thus, concluded that that there had been the "use or threat of force or violence or any other form of coercion or intimidation" that is necessary to establish rape.  (Id. ¶¶ 188-89.)

Plaintiff appealed the Panel's decision to the University's Disciplinary Appellate Officer ("DAO") on October 24, 2016, and asked the DAO to overturn both the Panel's judgment that he "had violated the University's Sexual Violence Policy and the sanction of expulsion and a permanent notation on his transcript."  (Id. ¶¶ 31, 224.)  Plaintiff argued that the Panel had not followed its own procedures, failed to abide by its promise to provide Plaintiff with fair process, and reached an arbitrary and capricious result.  (Id. ¶ 225.)  On December 12, 2016, the DAO issued an opinion, again affirming Plaintiff's responsibility, but reducing the sanction to a two-year suspension with no guarantee of readmission.  (Id. ¶¶ 32-33, 226.)

In reaching the decision to affirm Plaintiff's responsibility, the DAO stated that Plaintiff had received sufficient notice that he had been accused of a "sexual assault" occurring on June 8,

2016, and that the University had no obligation to provide any further detail regarding the accusation or its factual support until issuance of the Draft Report. (Id. ¶ 228(a).) The DAO further excused any deficiencies in the investigation, explaining that the Hearing Panel had the opportunity to conduct further examinations, and that Plaintiff had the opportunity to request testimony from additional witnesses. (Id. ¶ 228(c); see also Decl. of James A. Keller ("Keller Decl.") Ex. 4 ¶¶ 2(a), 3.) In addition, the DAO rejected Plaintiff's assertion that the investigative team distorted the facts and applied inconsistent credibility standards to Plaintiff and Jane, deferring to the credibility findings of the investigative team and the Hearing Panel and declining to specifically address Plaintiff's arguments that there were inconsistencies in Jane's accounts concerning what happened in Plaintiff's home. (Compl. ¶ 228(d)-(e); Keller Decl. Ex 4 ¶¶ 2(b)(ii)-(iv).) It also rejected Plaintiff's arguments that the panel members had undisclosed conflicts of interest because they have professional relationships with Jane's advisor, noting in part that it was Plaintiff's obligation to raise such objections prior to the hearing. (Compl. ¶ 228(f); Keller Decl. Ex. 4 ¶ 5.)

With respect to the reduction of the sanction to a two-year suspension with the opportunity to re-apply, the DAO noted that the two-member majority of the Hearing Panel appeared to have deferred to the sanction recommendation of the investigating officer. (Compl. ¶ 237(b); Keller Decl. Ex. 4 at 9.) The DAO further noted that the Panel decision did not directly reference any University precedent in spite of the Sexual Violence Policy's directive that it consider such precedent. (Compl. ¶ 237(b)-(c); Keller Decl. Ex. 4 at 9.) The DAO therefore reviewed University precedent and imposed the revised sanction, which it stated was harsher than that imposed in two less egregious cases and less harsh than that imposed in a more egregious case. (Compl. ¶ 232; Keller Decl. Ex. 4 at 9-10.)

The Complaint asserts seven claims for relief.[2]  Count I asserts a claim for breach of contract.  Count II asserts a claim for violation of Title IX of the Education Amendments of 1973 ("Title IX"), 20 U.S.C. § 1681 et seq.  Counts IV and V allege claims for Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED").  Count VI asserts a claim for violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-2 et seq.  Count VII and VIII assert claims for race discrimination, in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., and 42 U.S.C. § 1981.  Defendants have moved to dismiss all seven counts.

## II.    LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).  We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.  DelRio-Mocci v. Connolly Props. Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)).  Legal conclusions, however, receive no deference, as the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  Wood v. Moss, 134 S. Ct. 2056, 2065 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration

---

[2]  The Complaint initially asserted eight claims but Plaintiff has since withdrawn Count III, which asserted a negligence claim.

in original) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).   The complaint must contain

"'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to

draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"   <u>Warren</u>

<u>Gen. Hosp.</u>, 643 F.3d at 84 (quoting <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir.

2009)).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully."   <u>Iqbal</u>, 556 U.S. at 678 (citing

<u>Twombly</u>, 550 U.S. at 556).   In the end, we will grant a motion to dismiss brought pursuant to

Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief

above the speculative level.'"   <u>W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank</u>,

712 F.3d 165, 169 (3d Cir. 2013) (quoting <u>Twombly</u>, 550 U.S. at 555).

## III.   DISCUSSION

### A.   <u>Breach of Contract</u>

In Count I, Plaintiff asserts that Defendant breached its contract with him insofar as it

failed to abide by its policies and procedures with respect to disciplinary proceedings and

nondiscrimination.   Defendant moves to dismiss this claim in its entirety, asserting that it fails to

state a breach of contract claim upon which relief can be granted.

To state a claim for breach of contract under Pennsylvania law, a complaint must

specifically allege:   "'(1) the existence of a contract, including its essential terms, (2) a breach of a

duty imposed by the contract and (3) resultant damages.'"   <u>Kaymark v. Bank of Am., N.A.</u>, 783

F.3d 168, 182 (3d Cir. 2015) (quoting <u>Omicron Sys., Inc. v. Weiner</u>, 860 A.2d 554, 564 (Pa. Super.

Ct. 2004) (internal quotation marks omitted)).   "[T]he relationship between a private educational

institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of

action against [an] institution for breach of contract where the institution ignores or violates

portions of the written contract."   <u>Swartley v. Hoffner</u>, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)

(citations omitted). The contract between an educational institution and a student includes any "agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook." Reardon v. Allegheny College, 926 A.2d 477, 480 (Pa. Super. Ct. 2007) (citation omitted). We review such an agreement "as we would any other agreement between two private parties," id. (citing Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 428 (Pa. 2001)), and "students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides." Boehm v. Univ. of Pa. Sch. of Veterinary Med., 573 A.2d 575, 579 (Pa. Super. Ct. 1990) (citations omitted); see also id. (stating that a private university must substantially comply with established procedures before suspending or expelling a student (citations omitted)).

In ascertaining the duties that a contract imposes and whether they have been breached, the court must first interpret the terms of the contract. "The paramount goal of contract interpretation is to determine the intent of the parties." American Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009) (quotation omitted). "The strongest objective manifestation of intent is the language of the contract." Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011) (citations omitted). "When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." TruServ Corp. v. Morgan's Tool & Supply Co., 39 A.3d 253, 260 (Pa. 2012) (citing LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 647 (Pa. 2009)). Moreover, "[t]he whole instrument must be taken together in arriving at contractual intent." Murphy, 777 A.2d at 429 (citation omitted). "The meaning of an

unambiguous written instrument presents a question of law for resolution by the court."[3]  Id. at 430 (citing Cmty. Coll. v. Cmty. Coll., Soc'y of the Faculty, 375 A.2d 1267, 1275 (Pa. 1977)).

Here, the Complaint asserts that Defendant breached numerous provisions of the Student Disciplinary Procedures, as well as certain provisions of its Code of Student Conduct ("Code of Conduct") and Policy on Equal Opportunity and Affirmative Action ("Nondiscrimination Statement").  While the breach of contract claim focuses primarily on allegations that Defendant breached provisions promising that the disciplinary process would be "fair," it also asserts that Defendant breached specific provisions concerning notice, required training for investigators and Hearing Panel Members, the scope of the investigation, the applicable standard of proof, the composition of the Hearing Panel, the fashioning of an appropriate sanction, the appeal process, and nondiscrimination.

### 1.    Fairness

The Complaint alleges that Defendant breached provisions of the Student Disciplinary Procedures (the "Disciplinary Procedures") that promise "fair" proceedings.  Specifically, the Complaint alleges that Defendant breached provisions that pledge (1) to provide students "a process that is fundamentally fair, and free of bias or prejudice," (2) that the investigating officer will conduct a "thorough and fair investigation," and (3) that the hearing will be "fair[] and impartial."   (Compl. ¶¶ 253, 256-57; Compl. Ex. B. ¶¶ II.B.1, II.D, II.G.2.)

According to the Complaint, the disciplinary proceedings were not "fair" for a variety of reasons, including that Plaintiff was not given sufficient notice of the charges against him; the investigator did not keep accurate notes, skewed the facts in his report, and applied inconsistent credibility standards; the Hearing Panel reached unwarranted conclusions, ignored inconsistencies

---

[3] Neither Plaintiff nor Defendant contends that any aspects of the parties' contracts are ambiguous.

in Jane's story, slanted the facts in Jane's favor, applied inconsistent credibility standards, and was biased. (Compl. ¶¶ 203, 207-08, 212, 214, 243.) It also asserts that Defendant breached its duty to provide fair proceedings insofar as it trained the investigator and hearing panel members with materials infused with gender bias. (Id. ¶¶ 218-19.)

In making these claims, the Complaint employs a broad and unlimited interpretation of the word "fair." Plaintiff appears to take the position that the Complaint can state a cognizable breach of contract claim by simply alleging that some action that Defendant took in connection with the disciplinary proceeding was unfair to him or put him at a procedural disadvantage.[4] However, in interpreting the parties' intent in promising "fundamental fairness," and a "fair" investigation and hearing, we cannot consider those terms in isolation. See Murphy, 777 A.2d at 432 ("Simply put, the parties' contractual intent cannot be gleaned by ignoring all but one [term] in the Contract, and then reading that [term] out of context.") Rather, we must consider the terms in the context of the Disciplinary Procedures as a whole and with reference to the established understanding of "fundamental fairness" in this Commonwealth. When we do so, it becomes clear that the promises of "fairness" do not give rise to "fairness" obligations that are independent of, and separate from, the obligations imposed by the more specific provisions in the Disciplinary

---

[4] In asserting these claims, Plaintiff relies heavily on a decision of the United States District Court for the District of Massachusetts, Doe v. Brandeis University, 177 F. Supp. 3d 561 (D. Mass. 2016). In Brandeis, as in the instant case, a student brought breach of contract claims against a university after he was subjected to disciplinary proceedings and found to have engaged in sexual misconduct. Id. at 567. Brandeis, however, applied Massachusetts law, which requires school disciplinary proceedings to be conducted with "basic fairness," a concept the court acknowledged was "uncertain and elastic" with "little case law to serve as guideposts." Id. at 601. Pennsylvania, unlike Massachusetts, does not impose a "basic fairness" requirement. Accordingly, we decline to apply the "basic fairness" analysis employed in Brandeis and, instead, apply Pennsylvania law to ascertain the parties' intent in contracting for "fair" proceedings.

Procedures, which themselves describe proceedings designed to be "fair."[5]

### a. Fundamental Fairness

In Pennsylvania, a promise of "fundamental fairness" in connection with a university disciplinary proceeding ordinarily requires that a respondent be given "notice of the charges and some opportunity for a hearing."[6] Ruane v. Shippensburg Univ., 871 A.2d 859, 862 (Pa. Commw. Ct. 2005) (citing Boehm, 573 A.2d at 578–79). More particularly, case law in the Commonwealth indicates that a student is entitled to a "'statement of the specific charges and grounds which . . . would justify [discipline],'" and should be provided "'the names of the witnesses against him,'" "'an oral or written report on the facts to which each witness testifies,'" and an "'opportunity to present . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses on his behalf.'" Boehm, 573 A.2d at 578-79 (quoting Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158-59 (5th Cir. 1961)) (additional citations

---

[5] The Complaint also alleges that Defendant breached "fairness" provisions in the Code of Student Conduct, which afford every student "the right to fair University judicial process in the determination of accountability for conduct," and provisions in the Charter of the University's Student Disciplinary System that state that "[t]he purpose of the Student Disciplinary System is to further the educational mission of the University . . . by providing a fair and effective mechanism for investigating and resolving disputes involving students and alleged violations by students of the University's rules, regulations, and policies. (Compl. Ex. C ¶ II.d; Compl. Ex. D ¶ I.A.) We read these provisions in conjunction with the Disciplinary Procedures and do not construe them as providing a greater right to "fair" proceedings than that provided by the Disciplinary Procedures themselves.

[6] In Pennsylvania, a student at a State university is "entitled to a measure of due process comporting with basic principles of fundamental fairness" before the university can impose of disciplinary sanctions. Ruane, 871 A.2d at 862. This right to fundamental fairness does not ordinarily apply to students at private universities, such as the University of Pennsylvania. Reardon, 926 A.2d at 480 n.2 ("attempts to invoke due process concerns and questions of fundamental fairness are misplaced [in a breach of contract action against a private college] as [the court's] review is not guided by due process concerns" (citing Boehm, 573 A.2d at 580; Murphy, 777 A.2d at 428). Here, however, Defendant voluntarily contracted to provide a disciplinary process that was "fundamentally fair." (Compl. Ex. B ¶ II.B.1.) Accordingly, we interpret that term as it is used by the courts in this Commonwealth setting forth the standard of fundamental fairness for disciplinary proceedings at State universities.

omitted)). In addition, there should be a hearing at which the adjudicators are given "'an opportunity to hear both sides in considerable detail.'" Id. at 579 (quoting Dixon, 294 F.2d at 159). A university is not, however, required to provide "'a full-dress judicial hearing, with the right to cross-examine witnesses.'"[7] Id. (quoting Dixon, 294 F.2d at 159; see also Ruane, 871 A.2d at 862 (stating that a university is "not obligated to provide a 'full-dress judicial hearing,' subject to the rules of evidence or representation by counsel" (quoting Boehm, 573 A.2d at 579)).

Upon consideration of this legal authority interpreting the requirements of "fundamental fairness" in the university disciplinary setting, we reject Plaintiff's suggestion that the contractual promise to provide "a process that is fundamentally fair" demonstrates the parties' intent to provide "fair" procedures beyond those encompassed within this established meaning of "fundamental fairness." Moreover, we conclude that the detailed disciplinary procedures that Defendant sets forth in the Student Disciplinary Procedures satisfy the basic requirements of fundamental fairness as they plainly provide notice and an opportunity to be heard. Indeed, as set forth in greater detail below, the Disciplinary Procedures provide for, inter alia, a charge letter that notifies the respondent of the charges against him (Compl. Ex. B ¶ II.D), preparation of a draft factual investigative report, which is provided to respondent for both review and comment before the preparation of a final investigative report (id. ¶ II.E), a subsequent hearing during which both the complainant and the respondent are permitted to give their version of events, and other relevant and appropriate evidence is considered (id. ¶ II.G.2), and an opportunity for either party to appeal the Hearing Panel's decision (id. ¶ II.H.) Accordingly, given these procedures, which plainly satisfy the Commonwealth's basic requirements of "fundamental fairness," we conclude that the Complaint cannot, and does not, state a breach of contract claim upon which relief can be granted

---

[7] Indeed, Plaintiff concedes that he is not "entitled to strict judicial procedures." (Pl.'s Resp. in Opp. to Def.'s Mot. ("Pl.'s Opp. Br.") at 30.)

insofar as it alleges that Defendant breached its contractual duty to provide a process that was "fundamentally fair."

### b. Fair Investigation and Fair Hearing

As noted above, the Disciplinary Procedures also promise both that the investigating officer "will lead a thorough and fair investigation" and that hearings will be "fair and impartial." (Compl. Ex. B ¶¶ II.D, II.G.2.)   To ascertain the parties' intent in stating that the investigation and hearing must be fair, we must consider the context in which these statements are made.  See Murphy, 777 A.2d at 432 (stating that we must read language in disciplinary procedures in context).

In the Disciplinary Procedures, the contractual promise that the investigating officer will lead a "thorough and fair investigation" is immediately followed by a description of the precise procedures that the investigating officer and his team will follow.   Specifically, the Disciplinary Procedures require the investigation to "include interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence."   (Compl. Ex. B ¶ II.D.)   They also specify that the "complainant and respondent [are entitled to] have their advisors and/or outside counsel present for their interviews."   (Id. (footnote omitted); see also id. ¶ II.B.4.)   The Disciplinary Procedures further require the investigative team to prepare a draft report at the conclusion of the investigation and to provide a copy of that draft report to the complainant and respondent for review and comment.   (Id. ¶ II.E.1.)   "As a result of the response and comments received, the Investigative Team may conduct a further investigation and/or amend the draft report, if the Team determines either action to be warranted."   (Id. ¶ II.E.2.)   In this context, it is plain that the "fair" investigation that the parties' contemplated is that which is set forth in the paragraphs of the Procedures immediately following the promise of such an investigation.   Indeed, in the absence of any other indication as to what would be required of a

"fair" investigation, we cannot conclude that the parties intended to impose any additional requirements than those specifically set forth in the Procedures.

Similarly, the contractual promise to provide a "fair and impartial" hearing cannot be interpreted without reference to the entirety of the hearing procedures set forth in the Disciplinary Procedures. The Disciplinary Procedures state that "hearing[s] must be prompt, fair, and impartial, affording the complainant's allegations and the respondent's defenses all due consideration and protecting the rights of both parties." (Compl. Ex. B ¶ II.G.2.) To that end, the Procedures obligate the Hearing Panel to "review the Investigative Team's final report, including any response, objections, or comments provided by the complainant or respondent" and to "carefully review the evidentiary record, including witness statements, documents, and physical evidence." Id. They further require the Panel to separately interview the investigating officer, the complainant, and the respondent (id. ¶ II.G.2.i); to permit the complainant and respondent to be accompanied by an advisor or outside counsel during their interviews (id. ¶¶ II.G.2.i.a, d); and to allow the complainant and respondent to view other testimony via closed-circuit television upon request (id. ¶ II.G.2.i.a). At the same time, the Hearing Panel may, but is not required to, seek additional evidence from the investigating officer to clarify the evidentiary record, interview key witnesses on whom the investigating officer relied, and/or obtain testimony from newly-discovered witnesses or review other newly-discovered evidence. (Id. ¶ II.G.2.i.) With respect to impartiality, the Procedures require that the Hearing Panel be mixed-gender, trained and experienced in handling sexual misconduct, from academic departments in which neither of the parties are enrolled, free of personal ties to either party or either party's close associates, and have no personal knowledge of the alleged incident of sexual misconduct. (Id. ¶¶ II.G.1.ii-iv.) Under these circumstances, it is plain that the "fair and impartial" hearing that is promised is simply one that comports with the hearing requirements set forth in the Disciplinary Procedures. In fact,

there is no indication that the parties intended to impose other "fairness" or "impartiality" requirements than those specifically delineated.

We therefore conclude, based on the totality of the Disciplinary Procedures, which constitute the parties' contract, that the parties intended that "fair" hearings and investigations would be hearings and investigations that complied with the more specific provisions of the Disciplinary Procedures concerning hearings and investigations and did not intend to impose additional, unspecified "fairness" requirements. Accordingly, we further conclude that the Complaint cannot – and does not – state a breach of contract claim upon which relief can be granted insofar as it alleges that Defendant failed to provide a "fair" investigation or "fair" hearing without identifying some other, specific provision in the Disciplinary Procedures that was allegedly breached.

### 2. Other Allegations of Breach

Having concluded that Plaintiff cannot state a cognizable breach of contract claim based upon the alleged general unfairness of the disciplinary proceedings, we turn to the Complaint's other, more specific, allegations of breach. In particular, the Complaint alleges that Defendant breached provisions of the Disciplinary Procedures that require Defendant to inform students "about the process both before the process is initiated and throughout the process as it unfolds," and to conduct a "thorough" investigation that includes "interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence." (Compl. ¶¶ 255-56 (quotations omitted); Compl. Ex. B ¶¶ II.B.2, II.D.) In addition, the Complaint asserts that Defendant breached promises to provide an "impartial" hearing, to "train [faculty members who serve on hearing panels] to fulfill their responsibilities as adjudicators according to the [University's] procedures and policies . . . and to ensure compliance with Title IX," and to base any sanctions "upon the facts of the case and applicable University

precedent." (Compl. Ex. B. ¶¶ II.G.1.v., II.G.3.i; Compl. ¶¶ 257, 259, 261.) The Complaint also alleges that Defendant breached its contractual promise that the Disciplinary Appeals Officer ("DAO") "'will review the report of the Investigative Team and supporting evidence'" as well as the Hearing Panel's decision "'in order to ensure that the process [is] consistent with University policy and that the result was not arbitrary or capricious.'" (Compl. ¶ 260 (quoting Compl. Ex. B. ¶ II.H.1).) The Complaint further asserts that Defendant breached its contractual obligation to assess the evidence pursuant to a preponderance of the evidence standard. (Compl. ¶ 258; Compl. Ex. B ¶¶ II.E, G.3). Finally, the Complaint alleges that Defendant breached its obligation under the Disciplinary Procedures to provide "a process that is . . . free of bias or prejudice," and its obligations under the Code of Conduct and the Nondiscrimination Statement, insofar as those alleged contracts provide that Defendant does not discriminate against students based on race, color or sex, and that students have the right not to be discriminated against on those bases.[8] (Compl. ¶¶ 253, 262; Compl. Ex. B. ¶ II.B.1; Compl. Ex. C at II.c; Compl. Ex. E.)

### a. Notice

The Complaint alleges that Defendant breached its contractual obligations concerning notice by providing Plaintiff only vague and general notice of the allegations against him. (See

---

[8] The Complaint also alleges that Defendant breached its implied duty of good faith and fair dealing "as a result of the acts and omissions described herein." (Compl. ¶ 265); see Tuno v. NWC Warranty Corp., 552 F. App'x 140, 144 (3d Cir. 2014) ("Pennsylvania courts have recognized 'the general duty of contracting parties to perform their contractual obligations in good faith.'" (quoting Baker v. Lafayette Coll., 504 A.2d 247, 255 (Pa. Super. Ct. 1986)). Under Pennsylvania law, "a duty of good faith and fair dealing in a breach of contract claim must always be grounded in a specific provision of a contract." Nationwide Ins. Indep. Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co., 518 F. App'x 58, 62 (3d Cir. 2013) (citing Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000)). Thus, "in practice, the covenant of good faith functions 'as an interpretive tool' to aid the court in evaluating breach of contract claims but the implied duty is never 'divorced from specific clauses of the contract.'" Tuno, 552 F. App'x at 144 (quoting Northview Motors, 227 F.3d at 91). Accordingly, we do not separately consider any claim for breach of the duty of good faith and fair dealing, but instead assess the Complaint's alleged breaches of specific provisions of the contract in light of the parties' respective duties of good faith and fair dealing.

Compl. ¶¶ 149, 255.)   With regard to notice, the Disciplinary Procedures state that the complainant and respondent are "both entitled . . . to be informed about the process both before the process is initiated and throughout the process as it unfolds."   (Compl. Ex. B a ¶ II.B.2.)   They further state that the Investigating Officer will provide both the complainant and respondent with a "Statement of Charge Letter, based on the complaint and any preliminary investigation."   (Id. ¶ II.D.)

Although the Complaint claims that Defendant breached these provisions, it does not allege that Plaintiff was not informed of the process at the outset and as it unfolded, or that he did not receive a Statement of Charge Letter.   Rather, the Complaint alleges only that Plaintiff was not given details about Jane's story until two months after Jane made her complaint, when the investigator issued the Draft Report.   (Compl. ¶ 11.)   It also alleges that Defendant never provided Plaintiff with a copy of Jane's written complaint.   (Id. ¶ 127.)   However, the notice procedures in the Disciplinary Procedures did not require Defendant to provide a copy of the complaint to Plaintiff, nor did they require Defendant to provide Plaintiff with the level of factual detail that the Complaint alleges was lacking.   Accordingly, we conclude that the Complaint fails to assert a plausible and cognizable claim that Defendant breached the notice provisions of the parties' contract.

### b.    Training of Investigators and Hearing Panel Members

The Complaint alleges that Defendant breached its contractual obligations to train investigators and Hearing Panel members because the training provided was inadequate.   (Compl ¶¶ 115, 261.)   With respect to training, the Disciplinary Procedures state that members of the Hearing Panel will be selected "from a pool of faculty . . . that have training and experience in handling complaints involving sexual misconduct."   (Compl. Ex. B ¶¶ II.G.1.i-ii.)   They also provide that "[t]he University will train members of the pool to fulfill their responsibilities as

adjudicators according to the procedures and policies outlined" in the Procedures, which include the obligation to provide a process that is "free of bias," and "to ensure compliance with Title IX." (Id. ¶¶ II.G.1.v, II.B.1; Compl. ¶ 113.)   The Procedures also provide that the panel members will be "provided with 'just in time' training on adjudicating sexual violence cases."   (Compl. Ex. B ¶ II.G.1.v.)   In addition, the Procedures state that investigators will be "appropriately trained as investigators in handling sexual violence cases."   (Id. ¶ II.D.)

While the Complaint generally alleges that Defendant breached these training requirements, it does not allege that the members of Plaintiff's hearing panel were not trained regarding cases involving sexual misconduct, the University's procedures and policies, or "just in time" principles.   It likewise also does not allege that the individuals who investigated Jane's complaint were not trained to investigate sexual violence cases.   It alleges, however, that the training provided "does not promote fairness and impartiality" and, instead, "undermines principles of impartiality, favors complainants (typically female), and biases proceedings against respondents (typically male)."   (Compl. ¶ 115.)

Specifically, the Complaint alleges that officials who handled Plaintiff's case were trained with, among other materials, a document called "Sexual Misconduct Complaint: 17 Tips for Student Discipline Adjudicators" ("17 Tips").   (Id. ¶¶ 17, 28-29.)   That document warns against victim blaming; advises of the potential for profound, long-lasting, psychological injury to victims; explains that major trauma to victims may result in fragmented recall, which may result in victims "recount[ing] a sexual assault somewhat differently from one retelling to the next"; warns that a victim's "flat affect [at a hearing] does not, by itself, show that no assault occurred"; and cites studies suggesting that false accusations of rape are not common.   (Id. ¶¶ 120, 122-123.)   At the same time, the document advises that the alleged perpetrator may have many "apparent positive attributes such as talent, charm, and maturity" but that these attributes "are generally

irrelevant to whether the respondent engaged in nonconsensual sexual activity." (Id. ¶ 124.) It also warns that a "typical rapist operates within ordinary social conventions to identify and groom victims" and states that "strategically isolating potential victims[] can show the premeditation" commonly exhibited by serial offenders. (Id. ¶ 125); see also 17 Tips, http://www.legalmomentum.org/resources/guide-university-discipline-panels-sexual-violence (last viewed, July 28, 2017). The Complaint asserts that such guidance "encourage[s] investigators and adjudicators to believe the accuser, disregard weaknesses and contradictions in the accuser's story, and presume the accused's guilt." (Compl. ¶ 119.)

In light of these allegations, we conclude that the Complaint plausibly alleges that Defendant breached the contractual requirement that it train Hearing Panel members "to fulfill their responsibilities as adjudicators according to the procedures and policies outlined" in the Disciplinary Procedures and "to ensure compliance with Title IX." (See Compl. Ex. B ¶¶ II.G.1.i – ii, II.G.2.) In light of these same allegations, we also conclude that the Complaint plausibly alleges that the investigators were not "appropriately trained as investigators in handling sexual violence cases." (Id. ¶ II.D.) We therefore deny Defendant's Motion to Dismiss insofar as it seeks dismissal of Plaintiff's claim that Defendant breached its contract with Plaintiff in this regard.

### c.    Scope of Investigation

The Complaint alleges that the Defendant breached its contractual obligations to thoroughly investigate the facts giving rise to Jane's complaint. (Compl. ¶¶ 149, 175, 256.) The Student Disciplinary Procedures state that the investigating officer is "responsible for managing the complaint investigation and resolution process" and will conduct a "thorough and fair investigation." (Compl. Ex. B ¶¶ I.C n.3, II.D.) As noted above, the investigation must "include interviews of the complainant and respondent, interviews of witnesses, and review of

documentation, physical evidence, and other relevant evidence."  (<u>Id.</u> ¶ II.D.)

The Complaint does not allege that the investigating officer failed to interview Plaintiff, Jane and other witnesses, or failed to review documentation, physical evidence and other relevant evidence.  It nevertheless alleges that Defendant breached its contractual obligation to conduct a "thorough and fair" investigation insofar as it the investigator failed to follow certain leads and/or ask certain questions.[9]  Specifically, it alleges that the investigation was incomplete because the investigator failed to (1) interview John thoroughly about the facts relevant to affirmative consent (Compl. ¶ 143); (2) explore "any . . . motive [Jane] might have had to fabricate or exaggerate her story," including the motive to deflect blame from herself for leaving her roommate sitting outside their home all night (<u>id.</u> ¶ 166); (3) ask Jane or her friend about a "lighthearted" message that Jane sent to the friend after she told the friend that she had been assaulted, or look into any other communications that might have shed light on Jane's state of mind (<u>id.</u> ¶ 168), (4) ask the friend who was at the bar with Plaintiff and Jane on the night of June 7 whether he was with Plaintiff and Jane the whole time (<u>id.</u> ¶ 169), (5) obtain video recordings from the bars, or video recordings of Plaintiff's and Jane's walk home (<u>id.</u> ¶ 170); and (6) interview the person who accompanied Jane to the Women's Center, Special Services and the Police Department (<u>id.</u> ¶ 172).

Defendant argues that Plaintiff's breach of contract claim based on these alleged deficiencies fails to state a claim upon which relief can be granted because the Complaint does not plausibly allege that these deficiencies caused Plaintiff to suffer any damage.[10]  According to

---

[9] The Complaint also appears to allege that the Defendant breached its investigative responsibilities insofar as the investigator failed to keep accurate records of interviews.  (Compl. ¶ 149.)  However, the Complaint identifies no specific provisions in the Disciplinary Procedures that require a certain method of record-keeping.  Accordingly, this particular allegation does not a support cognizable breach of contract claim.

[10] Defendant also argues that the Complaint fails to state a cognizable breach of contract claim based on investigative deficiencies because it does not adequately allege that the contract

Defendant, any investigative deficiencies would have been remedied by the subsequent *de novo* hearing, where Plaintiff was offered the opportunity to present – and did present – his own version of events. Thus, it maintains that any errors in the investigation were cured by the *de novo* hearing.

We cannot, however, conclude at this stage of the proceedings that the alleged investigative deficiencies did not result in damages to Plaintiff. While Plaintiff had an opportunity to supplement his own testimony at the *de novo* hearing, the record as developed by the investigator went well beyond Plaintiff's account and was the factual backbone of the *de novo* hearing. Under these circumstances, it is simply premature to conclude that any investigative breaches did not cause any damage to Plaintiff. Accordingly, we deny Defendant's Motion to Dismiss the breach of contract claim insofar as the claim is grounded on the investigator's failure to conduct a "thorough" investigation that "include[d] interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence." (Compl. ¶ 256.)

### d.     Preponderance of the Evidence Standard

The Complaint alleges that Defendant breached its obligation to judge the evidence pursuant to a preponderance of the evidence standard at both the investigative stage and the hearing stage. (Id. ¶ 258.) The Disciplinary Procedures provide that the investigative team will prepare an investigative report that includes "a recommended finding as to responsibility." (Compl. Ex. B ¶ II.E.) In making the responsibility determination, the team is to use a preponderance of the evidence standard – that is, the team "must be convinced that it is more likely

---

entitled Plaintiff to "any specific manner of administrative investigation, apart from one that is timely resolved." (Def.'s Mem. in Support of Mot. to Dismiss at 20.) We reject this argument, however, because the Complaint plainly alleges, and the contract requires, that the investigator must conduct a thorough investigation that includes witness interviews and a review of relevant evidence. (Compl. ¶ 256; Compl. Ex. B ¶ II.D.)

than not that a violation of the Sexual Violence Policy has occurred." (Id.) Similarly, at the conclusion of any hearings, the Hearing Panel is required to "deliberate in private to decide whether a preponderance of the evidence shows that the respondent is responsible for a violation of the . . . Sexual Violence Policy." (Id. ¶ G.3.) Again, the Procedures state that "[p]reponderance of the evidence means that the Panel must be convinced based on the evidence that it is more likely than not that a violation has occurred." (Id.)

Here, the Complaint does not allege either that the investigative team or the Hearing Panel breached the contract by finding Plaintiff responsible when neither was actually convinced that it was more likely than not that Plaintiff was responsible for a violation of the Sexual Violence Policy. Furthermore, the Complaint alleges no facts that support a reasonable inference that the investigative team or Hearing Panel did not actually believe or conclude based on the evidence that it was more likely than not that Plaintiff had violated the Sexual Violence Policy. Rather, it alleges that the investigator and Panel misconstrued the evidence and misassessed credibility and therefore reached an erroneous result. However, such alleged errors, even if they occurred, do not give rise to a reasonable inference that the investigative team and Hearing Panel were not convinced by a preponderance of the evidence, based on their review of the evidence, that Plaintiff violated the Sexual Violence Policy. Accordingly, we dismiss Plaintiff's breach of contract claim insofar as it asserts that the investigative team and Hearing Panel did not abide by their contractual obligations to apply a preponderance of the evidence standard.

### e.     Impartial Hearing

The Complaint alleges that Defendant breached its contractual obligation to conduct an impartial hearing. (See Compl. ¶¶ 212, 257.) As noted above, the Disciplinary Procedures state that "[h]earings must be prompt, fair, and impartial, affording the complainant's allegations and the respondent's defenses all due consideration and protecting the rights of both parties."

(Compl. Ex. B ¶ G.2.)  Specifically, with respect to impartiality, the Disciplinary Procedures, state that "no faculty member should serve on the Panel who has a mentoring relationship or other personal relationship with either of the parties."  (Id. ¶ II.G.1.iii.)  They further provide that any "[f]aculty asked to serve should recuse themselves or be dismissed if they have any personal ties to either of the parties or to individuals with whom the parties are closely associated."  (Id. ¶ II.G.1.iv.)

Here, the Complaint does not allege that any member of the Panel had a mentoring relationship or other relationship with Jane or Plaintiff.   It likewise does not allege that any panel member had personal ties to Jane, Plaintiff, or any individuals with whom either Jane or Plaintiff are closely associated.   Rather, it alleges only that all three Panel members were "professionally affiliated" with the University's Gender, Sexuality and Women's Studies Program, and that Jane's advisor was likewise affiliated with that program.  (Compl. ¶¶ 213-14.)  This allegation of a common professional affiliation does not support a reasonable inference that the Panel Members and Jane's advisor had personal as opposed to professional ties.   Accordingly, although the Complaint conclusively alleges that the Panel Members should "never have selected to serve on the Panel, or . . . should have recused themselves or been dismissed," it fails to allege any facts that would have required dismissal or recusal under the Disciplinary Procedures.  (Id. ¶ 216.) Accordingly, we dismiss the breach of contract claim insofar as it alleges that Defendant breached the impartiality provisions of the Disciplinary Procedures.

### f.      Proposed Sanction

The Complaint alleges that Defendant breached its contractual obligations concerning the imposition of sanctions.  (See Compl. ¶ 259, 263-64.)   With respect to sanctions, the Disciplinary Procedures provide that the investigator shall include in his final report "[a] recommended sanction[], if appropriate," without specifying any standard for ascertaining an

appropriate sanction. (Compl. Ex. B. ¶ II.E.) Thereafter, if the Hearing Panel finds the respondent to be responsible, it "will . . . determine the appropriate sanction, by majority vote, based upon the facts of the case and University precedent, with a presumption in favor of the sanction recommended by the [Investigating Officer]." (Id. ¶ II.G.3.i.) If the sanction is appealed, the DAO will review the sanction to determine if it is "consistent with University policy" and not "arbitrary or capricious." (Id. ¶ II.H.1.) The Complaint alleges that the Investigator's recommended sanction of expulsion was not based on University precedent, that the Panel likewise imposed a sanction that was not based on the facts of the case or consistent with University precedent, and that the DAO ultimately imposed a sanction that was inconsistent with University precedent and University policy. (Compl. ¶¶ 174, 210-211, 238-39.).

However, as noted, the Disciplinary Procedures, on their face, do not require the investigator to make a recommendation based on University precedent. Accordingly, the Complaint does not state a cognizable claim of breach based on the investigator's failure to consider such precedent. Moreover, to the extent that the Hearing Panel is alleged to have breached its obligation to determine a sanction based upon the facts of the case and University precedent, Plaintiff's claim fails to state a claim upon which relief can be granted because the Complaint does not plausibly allege that Plaintiff was damaged by that alleged breach given that the DAO rejected the Hearing Panel's sanction (expulsion), and imposed a lighter one (a two-year suspension) that he based upon a consideration the facts of Plaintiff's case and University precedent. Finally, while the Complaint alleges that the DAO erroneously concluded that the ultimate sanction imposed was consistent with University precedent and University policy, it does not allege, and indeed, could not credibly allege, that the DAO did not engage in its contractually-obligated review to consider whether the sanction was consistent with University Policy or was arbitrary or capricious. Indeed, the Complaint specifically recounts the DAO's

discussion of University precedent and comparison of Plaintiff's case to that precedent. (Compl. ¶¶ 230-233.) Under these circumstances, we conclude that the Complaint fails to allege a cognizable claim that the Investigator, Hearing Panel, and/or DAO breached their obligations concerning sanctions under the Disciplinary Procedures, and we dismiss the breach of contract claim insofar as it rests on allegations that Defendant failed to follow the designated procedures concerning sanctions.

### g. Appeal

The Complaint alleges that Defendant breached its contractual obligations with respect to Plaintiff's appeal of the Hearing Panel's decision. (See Compl. ¶¶ 260, 264.) The Disciplinary Procedures specifically provide that the "[d]ecisions made by the [Hearing] Panel are considered final, subject only to appeal [to the DAO]." (Compl. Ex. B ¶ G.3.iii.) They further state that, on appeal, the DAO

> will review the report of the Investigative Team and supporting evidence, the audio record from the Panel Hearing in the discretion of the [DAO], and any other material the DAO deems relevant, in addition to the decision of the Panel in order to ensure that the process was consistent with University policy and that the result was not arbitrary or capricious.

(Id. ¶ II.H.1.)

Here, the Complaint does not allege that the DAO did not review the materials he was required to review, that he did not consider whether the process was consistent with University policy, or that he did not review whether the result was arbitrary or capricious. Rather, it alleges that the appeal that Defendant provided was not "meaningful," apparently based on allegations that the DAO did not adequately address Plaintiff's arguments regarding flaws in the investigation and hearing process. (Compl. ¶¶ 228, 264.) Where, however, the Complaint does not allege facts that support a reasonable inference that the DAO failed to comply with the specific procedures delineated in the parties' contract, but merely challenges the quality of those

27

procedures, it simply does not state a cognizable breach of contract claim. We therefore grant Defendant's Motion to Dismiss insofar as it seeks dismissal of the claim that Defendant breached the parties' contract by failing to provide a meaningful appeal.

### h. Nondiscrimination and Bias

The Complaint alleges that Defendant breached contractual obligations not to discriminate against, or be biased against, students based on race, color, or sex. (Compl. ¶¶ 253, 262, 264; see also id. ¶¶ 109-10). Specifically, it alleges that Defendant breached its promise in the Disciplinary Procedures to provide "a process that is . . . free of bias or prejudice." (Id. ¶ 253.) It further it alleges that Defendant breached a provision in the Code of Student Conduct that declares that every student has "the right to be free from discrimination on the basis of race, color, [or] gender" (Compl. Ex. C ¶ II.c), and the Nondiscrimination Statement, which states that the University "does not discriminate on the basis of race, color, [or] sex" (Compl. Ex. E). Among other allegations, the Complaint alleges that, throughout the disciplinary proceedings, "the University's agents demonstrated and acted on pervasive gender and racial stereotypes" and further alleges that the sanctions "recommended and imposed at each stage of the disciplinary process were more severe because of [Plaintiff's] race and gender." (Compl. ¶¶ 36, 41-42.)

Defendant argues that these breach of contract claims do not state claims upon which relief can be granted because the Complaint pleads no facts that support an inference of racial or gender bias or discrimination. According to Defendant, Plaintiff asks the Court to infer discriminatory conduct from the mere fact that Plaintiff is an African-American male who was found responsible for misconduct.

We agree with Defendant that the Complaint fails to allege facts that give rise to an inference of racial bias or discrimination, but rather relies exclusively on conclusory allegations that Plaintiff was treated unfairly because of his race. See discussion infra Section III.E. We

disagree, however, that the Complaint fails to allege facts that give rise to an inference of gender bias or discrimination. Rather, as set forth at greater length below, the Complaint alleges various facts that, read in the light most favorable to Plaintiff, give rise to a reasonable inference that gender bias or discrimination infected the disciplinary proceedings. See discussion infra Section III.B.1. Accordingly, we decline to dismiss Plaintiff's breach of contract claim grounded in Defendant's obligations not to discriminate and to provide proceedings free of bias or prejudice, but we limit that claim to one grounded on discrimination or bias based on gender.

In sum, we grant the Defendant's Motion to Dismiss the breach of contract claim insofar as that claim asserts that Defendant breached contractual obligations to be fair, provide notice, apply a preponderance of the evidence standard, conduct an impartial hearing, impose sanctions based on University precedent, afford a meaningful appellate process, and provide a process free of racial bias and discrimination. However, we deny the Motion to Dismiss the breach of contract claim insofar as that claim asserts that Defendant breached its contractual obligations to conduct a thorough investigation, provide certain training to Investigators and Hearing Panel Members, and provide a process free of gender bias or discrimination.

**B.     Title IX**

Count II of the Complaint asserts that Defendant violated Title IX by discriminating against Plaintiff on the basis of his gender. (Compl. ¶¶ 278, 281-95.) Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Among other things, it "bar[s] the imposition of university discipline where gender is a motivating factor," and it is enforceable through a private right of action for damages and injunctive relief. Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 714-15 (2d Cir. 1994)). Most Title IX cases fall

within one of two categories: "erroneous outcome" and "selective enforcement." <u>Harris v. St.</u>

<u>Joseph's Univ.</u>, Civ. A. No. 13-3937, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014) ("Harris

I") (citing <u>Scott v. Worldstarhiphop, Inc.</u>, Civ. A. No. 10-9538, 2011 WL 5082410, *4 (S.D.N.Y.

Oct. 25, 2011)). A third far-less common category of cases are those that proceed upon a

"deliberate indifference" theory. <u>See, e.g.</u>, <u>Mallory v. Ohio Univ.</u>, 76 F. App'x 634, 638 (6th Cir.

2003). Plaintiff seeks to proceed under all three theories.[11]

### 1.      Erroneous Outcome

In an erroneous outcome case, the plaintiff contends that he is "innocent and [was]

wrongly found to have committed an offense." <u>Yusuf</u>, 35 F.3d at 715. Significantly,

"allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and

erroneous outcome combined with a conclusory allegation of gender discrimination is not

sufficient to survive a motion to dismiss." <u>Id.</u> Rather, to state a claim upon which relief can be

granted under an erroneous outcome theory, a plaintiff must allege "'particular circumstances

suggesting that gender bias was a motivating factor behind the erroneous finding.'" <u>Harris I</u>,

2014 WL 1910242, at *4 (quoting <u>Worldstarhiphop</u>, 2011 WL 5082410, at *4); <u>see also</u> <u>Yusef</u>, 35

F.3d at 715 (same).

"Such allegations might include, *inter alia*, statements by members of the disciplinary

tribunal, statements by pertinent university officials, or patterns of decision-making that also tend

to show the influence of gender." <u>Yusuf</u>, 35 F.3d at 715. So, for example, a complaint was

---

[11] The Complaint references a fourth theory called "archaic assumptions," but Plaintiff does not, at present, contend that the Complaint states a claim under this theory. Instead, he states in his brief that "because he has amply supported his Title IX claims, he will not separately discuss an 'archaic assumptions' theory at this time." (Compl. ¶¶ 278, 292; Pl.'s Opp. Br. at 50 n.29.) Accordingly, we likewise will not address the "archaic assumptions" theory, except to note that it does not appear to apply here. <u>See</u> <u>Doe v. Cummins</u>, 662 F. App'x 437, 451 n.9 (6th Cir. 2016) ("The 'archaic assumptions' standard appears limited to unequal athletic opportunities." (citing <u>Mallory</u>, 76 F. App'x at 638-39 (6th Cir. 2003); <u>Marshall v. Ohio Univ.</u>, Civ. A. No. 15-775, 2015 WL 7254213, at *8 (S.D. Ohio Nov. 17, 2015))).

found to adequately allege **gender** bias when it alleged that a member of a university's ethics department and community standards board specifically stated to a plaintiff's father that the university had "adopted a policy favoring female accusers as [the university] was concerned about Title IX charges by female students." Harris v. St. Joseph's Univ., Civ. A. No. 13-3937, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014) ("Harris II") (citation omitted). Likewise, a complaint was found to sufficiently allege gender bias where it alleged that (1) a former University employee stated that the university treats male students as "guilty, until proven innocent" and "operate[d] under the assumption that it's always the 'boy's fault,'" (2) a University professor stated that there is "overwhelming" gender bias in sexual misconduct cases at the University, and (3) a University professor agreed that the "culture of thinking" on the campus is that males are bad and females are victims. Doe v. Brown Univ., 166 F. Supp. 3d 177, 189 (D.R.I. 2016).

Here, the Complaint alleges that the disciplinary proceedings against Plaintiff not only led to an erroneous outcome, but were infused with gender bias. In asserting that gender bias was ultimately the reason for the erroneous outcome, the Complaint alleges generally that Defendant designed its disciplinary procedures to favor female complainants and disfavor the respondents, who are almost always male. (Compl. ¶¶ 279-80.) It specifically alleges that Defendant's training materials for university employees who are involved in disciplinary proceedings encourage the employees to believe the accuser and presume the accused's guilt. (Id. ¶ 283; see discussion supra Section III.A.2.b.) It also alleges that the Penn Women's Center published Student Guidelines concerning the Sexual Violence Policy that refer to complainants as "victims/survivors." (Compl. ¶ 290.) The Complaint further alleges that certain unidentified "University personnel" have publicly advocated for other colleges and universities to combat sexual violence on campuses and strengthen protection of victims by engaging in "victim-centered respons[es]." (Id. ¶ 284 (emphasis added).) In addition, it alleges that Defendant's

implementation of discipline for sexual assault has been influenced by criticism it has received in the past for not taking the complaints of female students sufficiently seriously, noting, in particular, (1) a 2016 Daily Pennsylvanian newspaper article criticizing Defendant for "victim blaming" and imposing short sentences," and (2) a 2015 article that quoted Defendant's President and Provost as stating that the university was "redoubling [its] efforts" to "tackle [the] problem" identified in the "deeply troubling" results of a study showing that a third of female students had reported being sexually assaulted and that female students were significantly more likely to be sexually assaulted than male students.  (Id. ¶¶ 286-89.)

These allegations are less compelling than those that were found to state a Title IX claim in Harris and Brown, because they do not include an allegation of any arguably inculpatory statements by a representative of the University.   However, we nevertheless conclude that, taken together and read in a light most favorable to Plaintiff, the Complaint's allegations regarding training materials and possible pro-complainant bias on the part of University officials set forth sufficient circumstances suggesting inherent and impermissible gender bias to support a plausible claim that Defendant violated Title IX under an erroneous outcome theory.

### 2.      Selective Enforcement

In a selective enforcement case, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."   Yusuf, 35 F.3d at 715.   To state a selective enforcement claim upon which relief can be granted, a male plaintiff must allege "that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational institution]," Tafuto v. N.J. Inst. of Tech., Civ. A. No. 10-4521, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011) (quoting Mallory, 76 F. App'x at 641) (alteration in original), and must also allege "'particular circumstances suggesting that **gender** bias was a motivating factor behind the inconsistency,'"

Harris I, 2014 WL 1910242, at *4 (quoting Worldstarhiphop, 2011 WL 5082410, at *4).   Thus, a

plaintiff can state a claim for selective enforcement by alleging that "'the [university's] actions

against [the male plaintiff] were motivated by his gender and that a similarly situated woman

would not have been subjected to the same disciplinary proceedings.'"   Tafuto, 2011 WL

3163240, at *2 (second alteration in original) (quoting Doe v. Univ. of the South, 687 F. Supp. 2d

744, 757 (E.D. Tenn. 2009)).

Defendant argues that the Complaint fails to state a selective enforcement claim upon

which relief can be granted because it does not allege that any similarly situated female was treated

differently than Plaintiff.[12]   In fact, the Complaint does not identify any similarly situated female

who was treated more favorably, alleging that "[i]nformation concerning the outcome of

disciplinary proceedings involving male students as compared to female . . . is in the exclusive

possession and control of [Defendant]."   (Compl. ¶ 291.)   The Complaint alleges, however,

based upon information and belief, that "statistics . . . will show a pattern of . . . selective

enforcement based on gender."   (Id.)   Plaintiff concedes that he has no information about how

the University treats female students accused of serious sexual or non-sexual misconduct and, as a

result, the Complaint contains no specific factual allegations regarding differential treatment.

(Pl.'s Opp. Br. at 47-48.)   He asks, however, that we permit him to engage in discovery designed

to develop factual allegations to support his claim that females charged with misconduct are

treated less severely than he was.

Given that we are already permitting Plaintiff to proceed on the Title IX claim based on an

erroneous outcome theory, and that certain critical information that would support a Title IX claim

---

[12]   Defendant also argues that the Complaint does not sufficiently allege that the
disciplinary proceedings were affected by Plaintiff's gender.   However, for the reasons set forth
above, see discussion supra Section III. B.1, we conclude that the Complaint contains sufficient
factual allegations to give rise to an inference that Plaintiff's gender did affect the proceedings.

based on a selective enforcement theory is undeniably within the University's exclusive control, we will permit Plaintiff to conduct discovery to ascertain whether, in fact, there are facts to support his allegations, based on information and belief, that similarly situated females are treated more favorably than he was. We therefore deny Defendant's Motion insofar as it seeks dismissal of Plaintiff's Title IX claim based on a theory of selective enforcement.

### 3. Deliberate Indifference

In asserting his Title IX claim under a deliberate indifference theory, Plaintiff relies on a decision of the United States Court of Appeals for the Sixth Circuit, Mallory v. Ohio University, 76 F. App'x 634 (6th Cir. 2003). Mallory states that the "deliberate indifference" standard is applicable "where a plaintiff seeks to hold an institution liable for sexual harassment and requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." Mallory, 76 F. App'x at 638 (citing Gebser v. Lago Vista Indep. Sch. Dist.., 524 U.S. 274, 277 (1998)); see also Bostic v. Smyrna Sch. Dist., 418 F.3d 355 (3d Cir. 2005) (addressing claim that school violated Title IX when it was deliberately indifferent to sexual relationship between track coach and student). While the Sixth Circuit recognized that the deliberate indifference standard applies when a plaintiff seeks to hold an institution liable for sexual harassment, it expressed skepticism that the standard could also be applied to determine "when intentional discrimination has occurred in a case where a student has relied on Title IX to challenge either the initiation or the outcome of a disciplinary proceeding." Mallory, 76 F. App'x at 638-39. Other courts have expressed similar skepticism "that the case law governing claims of 'deliberate indifference' under Title IX can be applied in any coherent fashion to the facts of [a] case" in which a plaintiff "alleges[s] discriminatory application of a facially gender-neutral policy by school officials," such as where "the accused in a sexual misconduct proceeding sue[s] . . . based on allegations that

school officials meted out unlawfully discriminatory discipline." Doe v. Baum, 227 F. Supp. 3d 784, 820 (E.D. Mich. 2017) (citations omitted); see also Brown, 166 F. Supp. 3d at 191 (observing that "deliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault" and questioning its application in other contexts); Univ. of the South, 687 F. Supp. 2d at 757-58 (dismissing deliberate indifference claim because the complaint did not allege that the university's actions constituted sexual harassment).

We are likewise skeptical that a Title IX deliberate indifference claim can be pursued "to challenge either the initiation or the outcome of a disciplinary proceeding" and that such a claim is not limited to situations in which deliberate indifference is alleged to have "cause[d] students to undergo harassment or ma[d]e them liable or vulnerable to it." Mallory, 76 F. App'x at 638 (citation omitted); Univ. of the South, 687 F. Supp. 2d at 757 (citing Patterson v. Hudson Area Schs., 551 F.3d 438, 446 (6th Cir. 2009)). However, even assuming arguendo that the Title IX deliberate indifference standard can be applied in a case such as this one, we conclude that the Complaint fails to state a claim upon which relief can be granted because it does not adequately allege deliberate indifference on the part of Defendant.

"To establish deliberate indifference, 'the [official's] response [to the alleged gender bias] . . . [must be] clearly unreasonable in light of the known circumstances.'" Brown Univ., 166 F. Supp. 3d at 190-91 (third alteration in original) (quoting Univ. of the South, 687 F. Supp. 2d at 757). Here, the Complaint alleges that Defendant was "on notice of, and was deliberately indifferent to, the serious flaws in the investigation and the hearing process, the lack of equity and fairness, and the gender bias that infused the process." (Compl. ¶ 293.) However, Plaintiff asserts only that he himself brought the alleged gender bias and other procedural flaws to the attention of disciplinary officials, and that he did so during the course of the disciplinary proceedings. (Pl.'s Opp. Br. at 50 (asserting that Plaintiff "brought his concerns to the attention

of all six of the officials that the University assigned to handle this matter" and raised "the University's violations of its own policies and procedures" with the University's Designated Appeal Officer)). We conclude that the Complaint does not state a cognizable claim of deliberate indifference based solely on an assertion that Plaintiff advanced arguments of gender bias and other procedural flaws in the adversarial disciplinary proceeding and Defendant rejected them.[13] Accordingly, we dismiss Plaintiff's Title IX claim to the extent that is based on deliberate indifference theory because the Complaint does not plausibly allege deliberate indifference.

---

[13] We are aware of only one case in which a court permitted a plaintiff who had been disciplined by a university for sexual assault to pursue a deliberate indifference Title IX claim against the university, concluding that the complaint adequately alleged deliberate indifference. In Wells v. Xavier University, 7 F. Supp. 3d 746 (S.D. Ohio 2014), the plaintiff, a student at Xavier University, was falsely accused of sexual assault by his female resident advisor. Id. at 747. The complaint alleged that Xavier had been under federal investigation concerning its alleged mishandling of at least three prior sexual assault allegations and that, as a result, Xavier "made [the plaintiff] into a scapegoat so as to demonstrate a better response" to such allegations. Id. Moreover, the complaint alleged that, in plaintiff's case, the county prosecuting attorney investigated the rape allegation, doubted the accusation, "attempted to communicate his doubts" to Xavier's president, and specifically asked the president to "hold off on any campus investigation pending the outcome of his official investigation." Id. at 748. According to the complaint, rather than delaying its own investigation, Xavier held an unfair disciplinary hearing that did not comply with its policies for such proceedings, found the plaintiff to be responsible for a "serious violation of the Code of Student Conduct," and determined that the plaintiff would be expelled. Id. (internal quotation marks omitted). Under these circumstances, the court refused to dismiss the plaintiff's Title IX deliberate indifference claim, concluding that the plaintiff had adequately alleged that Xavier's president was deliberately indifferent to the plaintiff's rights because it alleged that Xavier had pursued disciplinary proceedings in spite of the prosecuting attorney having warned the president that the claims of sexual assault were unfounded, and also alleged that the president allowed a defective hearing to proceed "with the goal of demonstrating [to federal investigators] that [it] was taking assault allegations seriously." Id. at 752. We find our case to be factually distinguishable from Wells because Plaintiff's Complaint does not allege either that Defendant had been informed by a state prosecutor that Jane's sexual assault claim was unfounded or that the University pursued disciplinary proceedings to impress federal investigators who had been scrutinizing its prior mishandling of sexual assault allegations. Accordingly, we do not find Wells to support a conclusion that the Complaint in our case adequately alleges that Defendant was deliberately indifferent to Plaintiff's rights.

In sum, we grant Defendant's Motion to Dismiss the Title IX claim insofar as that claim rests on a deliberate indifference theory, but deny the Motion to Dismiss the Title IX claim insofar as that claim rests on erroneous outcome and selective enforcement theories.

## C.    IIED

Count IV of the Complaint asserts a claim for Intentional Infliction of Emotional Distress. To establish an IIED claim under Pennsylvania law, a plaintiff must show that (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the plaintiff's distress is severe.    Hill v. Borough of Doylestown, Civ. A. No. 14-2975, 2015 WL 1874225, at *5 (E.D. Pa. Apr. 23, 2015) (citing Rosembert v. Borough of E. Landsdowne, 14 F. Supp. 3d 631, 645 (E.D. Pa. 2014)).    Under this standard, Pennsylvania courts have found "sufficient basis" for an IIED claim only when "presented [with] the most egregious conduct."    Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (citations omitted).    Such conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."    Id. (citation omitted).    In other words, the tort is reserved "for only the most clearly desperate and ultra extreme conduct."    Id.    Thus, courts in this district have "'repeatedly found'" that "'[a]s reprehensible as deliberate discrimination can be, . . . discrimination alone does not meet the extreme and outrageous conduct standard necessary to state a claim for [IIED].'"    Harris I, 2014 WL 1910242, at *11 (quoting Stokley v. Bristol Borough Sch. Dist., Civ. A. No. 13–3277, 2013 WL 4787297, at *3 (E.D. Pa. Sep. 9, 2013)) (first alteration in original).

Defendant argues that the Complaint fails to state an IIED claim upon which relief can be granted because it fails to allege extreme or outrageous conduct sufficient to support such a claim. Plaintiff maintains that the Complaint states a cognizable IIED claim because it alleges that

University officials distorted the facts of Plaintiff's and Jane's encounter, improperly attacked Plaintiff's credibility, unjustifiably branded Plaintiff a rapist, threatened Plaintiff with expulsion when expulsion was not justified, and ultimately imposed an unfair sanction. Such conduct, however, even if objectionable, is simply not the type of "desperate and ultra extreme conduct" that is "beyond all possible bounds of decency" such that it gives rise to an IIED claim in Pennsylvania. Hoy, 720 A.2d at 754; see Harris I, 2014 WL 1910242, at *11-12 (concluding that complaint failed to allege outrageous conduct sufficient to support an IIED claim when it alleged that university took disciplinary actions based upon false information and falsely portrayed plaintiff as a sex offender); see also Brandeis, 177 F. Supp. 3d at 617 (concluding that complaint failed to allege outrageous conduct sufficient to support an IIED claim when it alleged that university employed unfair and unreasonable procedures in a disciplinary hearing and improperly branded plaintiff sexual predator); Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 247 (D. Vt. 1994) ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim.") Accordingly, we conclude that the Complaint fails to state an IIED claim upon which relief can be granted, and we grant Defendant's Motion insofar as it seeks dismissal of that claim.

### D. NIED

Count V of the Complaint asserts a claim of Negligent Infliction of Emotional Distress. In Pennsylvania, a plaintiff may bring a claim for NIED in four factual scenarios:

> (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

Toney v. Chester Cnty. Hosp., 961 A.2d 192, 197-98 (Pa. Super. Ct. 2008) (citing Doe v. Phila. Cmty. Health Alternatives AIDS Task Force, 745 A.2d 25, 27 (Pa. Super. Ct. 2000), aff'd, 767 A.2d 548 (Pa. 2001)). "Moreover, 'a Plaintiff who alleges negligent infliction of emotional distress must suffer immediate and substantial physical harm.'" Johnson v. Caputo, Civ. A. No. 11-2603, 2013 WL 2627064, at *13 (E.D. Pa. June 12, 2013) (quoting Phila. Cmty. Health Alt., 745 A.2d at 28). Under this standard, a plaintiff may "establish physical harm or injury as physical manifestations of a psychic injury" by establishing "'symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and . . . ongoing mental, physical and emotional harm.'" Schmidt v. Boardman Co., 11 A.3d 924, 956 (Pa. 2011) (alteration in original) (quoting Love v. Cramer, 606 A.2d 1175, 1179 (Pa. 1992)). Similarly, "'knots' in a plaintiff's stomach, nightmares, low self-esteem, being susceptible to fright, and major depression [are] cognizable symptoms of a physical manifestation of emotional distress." Id. (citing Brown v. Phila. Coll. of Osteopathic Med., 674 A.2d 1130, 1137 (Pa. Super. Ct. 1996)).

Here, Defendant argues that the Complaint does not state an NIED claim upon which relief can be granted because it does not sufficiently allege that Plaintiff suffered "immediate and substantial physical harm." Johnson, 2013 WL 2627064, at *13. The Complaint, however, alleges that Defendant's conduct caused Plaintiff "severe emotional distress, which include[d] symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night." (Compl. ¶ 316.) We conclude that such allegations are sufficient to support a plausible claim of physical injury under the standards set forth above. We therefore deny Defendant's Motion insofar as it seeks to dismiss the NIED claim.

## E.   UTPCPL

Count VI of the Complaint asserts a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law.   Specifically, the Complaint alleges that Defendant engaged in unfair and deceptive acts insofar as it made various contractual commitments to Plaintiff and then did not honor those commitments.   (See Compl. ¶ 321.)

As a general matter, the UTCPCL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."   73 Pa. Stat. Ann. § 201–3.   To state a plausible claim under the UTPCPL, a complaint must allege that: "(1) [plaintiff] purchased or leased goods or services primarily for a personal, family, or household purpose; (2) [plaintiff] suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL."   Baynes v. George E. Mason Funeral Home, Inc., Civ. A. No. 09–153, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011) (citing 73 Pa. Stat. Ann. § 201–9.2(a)).   The Complaint must also allege that the plaintiff justifiably relied on the deceptive conduct.   See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 221–22 (3d Cir. 2008) (stating that plaintiff pursuing a claim under the UTPCPL must prove justifiable reliance).

Defendant argues that we should dismiss the UTPCPL claim because the claim violates the economic loss doctrine.   "The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.'"   Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)).   While the Pennsylvania Supreme Court has not decided whether the economic loss doctrine applies to statutory claims under the UTPCPL, the Third Circuit has predicted that that the Pennsylvania Supreme Court would hold that it does. Werwinski, 286 F.3d at 681.   Consequently, the doctrine limits a plaintiff bringing both UTPCPL and contract claims to his or her contract claims "'when loss of the benefit of a bargain is the

plaintiff's sole loss.'"  Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001) (quoting Duquesne Light, 66 F.3d at 618).  To avoid application of the economic loss doctrine, a plaintiff must articulate "harm that is distinct from the disappointed expectations evolving solely from an agreement."  Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., Civ. A. No. 06–3959, 2006 WL 3097771, at *3 n.3 (E.D. Pa. Oct. 30, 2006) (citing Sun Co. v. Badger Design & Constructors, Inc., 939 F. Supp. 365, 371 (E.D. Pa. 1996)).

Plaintiff argues that we should not apply the economic loss doctrine to bar his UTPCPL claim because the Pennsylvania Superior Court has concluded, since the Third Circuit decided Werwinski, that the doctrine does not apply to UTPCPL claims.  See Dixon v. Northwestern Mutual, 146 A.3d 780, 790 (Pa. Super. Ct. 2016); Knight v. Springfield Hyundai, 81 A.3d 940, 951-52 (Pa. Super. Ct. 2013).  However, "the Werwinski decision is binding on the district courts in the Third Circuit until either the Pennsylvania Supreme Court or the Third Circuit rules otherwise."  Murphy v. State Farm Mut. Auto. Ins. Co., Civ. A. No. 16-2922, 2016 WL 4917597, at *5 (E.D. Pa. Sep. 15, 2016) (citing McGuckin v. Allstate Fire & Cas. Ins. Co., 118 F. Supp. 3d 716, 720 (E.D. Pa. 2015)).  We therefore apply Werwinski, conclude that the economic loss doctrine bars Plaintiff's UTPCPL claim, and grant Defendant's Motion to Dismiss insofar as it seeks dismissal of the UTPCPL claim.

### E.    Title VI and § 1981

Counts VII and VIII of the Complaint assert that Defendant discriminated against the Plaintiff on the basis of his race, in violation of Title VI and § 1981, insofar as it applied a different credibility standard to him than it did to Jane, who is Caucasian, assumed him to be an aggressor on account of his race, and imposed a more severe sanction on him than it has previously imposed on non-African-Americans.  (Compl. ¶¶ 40-42, 242.)

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In order to state a cognizable claim under Title VI, a plaintiff must allege that (1) he is a member of a protected class; (2) he was "qualified to continue in pursuit of [his] education"; (3) he "suffered an adverse action"; and (4) the adverse action "occurred under circumstances giving rise to an inference of discrimination." Blunt v. Lower Merion Sch. Dist., 826 F. Supp. 2d 749, 758 (E.D. Pa. 2011), aff'd, 767 F.3d 247 (3d Cir. 2014) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)). In addition, the plaintiff must allege "intentional discrimination," which may be supported by allegations of either discriminatory animus or deliberate indifference. David v. Neumann Univ., 177 F. Supp. 3d 920, 927 (E.D. Pa. 2016) (citing Blunt, 767 F.3d at 272, and Pa. Transp. Auth. v. Gilead Scis., Inc., 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015)).

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts," and has been construed to forbid all racial discrimination with respect to both private and public contracts. 42 U.S.C. § 1981(a); Saint Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987) (citing Runyon v. McCrary, 427 U.S. 160, 168 (1976)). Like a claim brought pursuant to Title VI, a claim brought pursuant to § 1981 requires allegations of intentional discrimination. Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir. 2002) (citing Gen. Bldg. Contractors Assoc. v. Pennsylvania, 458 U.S. 375, 391 (1982)) (additional citation omitted).

Defendant argues that Plaintiff has failed to allege a facially plausible claim under either Title VI or § 1981 because the Complaint fails to allege circumstances that give rise to an inference of intentional racial discrimination. Plaintiff argues that the Complaint satisfies this pleading requirement because it alleges that the initial recommended sanction of expulsion was not based

on University precedent and that the final recommendation of suspension was more severe than the recommended sanctions in comparable cases. The Complaint alleges, upon information and belief, that "the respondents in [the] comparable matters . . . were not African American[s]" and "the sanctions recommended and imposed at each stage of the disciplinary process were more severe because of [Plaintiff's] race and gender." (Compl. ¶¶ 36, 242.) The Complaint further alleges that Defendant "applied different standards to Jane, a white female, and [Plaintiff], an African American male, . . . and assumed that a young African American male in a sexual encounter with a white female must have been the aggressor." (Compl. ¶ 41.) Finally, Plaintiff points to an allegation that one Hearing Panel member has published an article that reported "that 10% of African American male college students report that they have perpetrated rape (as compared to 4% of white males)." (Id. ¶ 222.)

However, in spite of the Complaint's conclusory allegation that Plaintiff was treated differently in the disciplinary proceedings due to his race, the Complaint alleges no facts that actually support such an inference. Indeed, no reasonable inference of intentional racial discrimination during the disciplinary proceedings can be drawn from the mere facts that Plaintiff is African American, Jane is Caucasian, Jane was found to be more credible than Plaintiff, and one Hearing Panel member wrote in an article that more African American male college students report that they perpetrated rape than Caucasian male college students do. Moreover, while the Complaint baldly alleges that African Americans have been subjected to more severe sanctions for sexual assault than Caucasians have, it fails to allege any facts in support of that conclusory allegation, much less any facts that would "raise a reasonable expectation that discovery will reveal evidence" of such disparate treatment. Phillips, 515 F.3d at 234 (quotation omitted). Accordingly, we conclude that none of the Complaint's allegations, even in context and construed in Plaintiff's favor, give rise to a reasonable inference that Defendant treated Plaintiff differently

because of his race.  We therefore grant Defendant's Motion to Dismiss insofar as it seeks dismissal of Plaintiff's claims brought pursuant to Title VI and § 1981 in Counts VII and VIII.

## IV.    CONCLUSION

For the foregoing reasons, we grant in part and deny in part Defendant's Motion to Dismiss.  Specifically, we grant the Motion insofar as it seeks dismissal of Count IV (IIED), Count VI (UTPCPL), Count VII (Title VI) and Count VIII (§ 1981), and we dismiss those four Counts in their entirety.   We also grant the Motion insofar as it seeks dismissal of Count II's Title IX claim grounded on a deliberate indifference theory, but we deny the Motion insofar as it seeks dismissal of Count II's Title IX claims grounded on erroneous outcome and selective enforcement theories.   In addition, we grant the Motion insofar as it seeks dismissal of Count I's breach of contract claims grounded on contractual obligations concerning fairness, notice, the preponderance of the evidence standard, an impartial hearing, the recommended sanction, appellate review, and racial bias or discrimination, but we deny the Motion insofar as it seeks dismissal of the breach of contract claims based on violation of the contractual duties to conduct a thorough investigation, to train investigators and members of the Hearing Panel, and to provide a process free of gender bias or gender discrimination.   Finally, we deny the Motion with respect to Plaintiff's claim in Count V (NIED).

An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.